# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Coots*, 2012 IL App (2d) 100592

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. AMANDA K. COOTS, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-10-0592 |
| Filed | April 16, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for drug-induced homicide arising from the death of her companion from heroin was reversed and the cause was remanded for a new trial where defense counsel was ineffective in failing to request a complete instruction on the meaning of "delivery," especially when the jury's question about the meaning of "delivery" suggested that defendant could be found guilty of drug-induced homicide for merely handing heroin to the victim. |
| Decision Under Review | Appeal from the Circuit Court of McHenry County, No. 09-CF-827; the Hon. Sharon L. Prather, Judge, presiding. |
| Judgment | Reversed and remanded. |

| Counsel on Appeal | Thomas A. Lilien and Barbara R. Paschen, both of State Appellate Defender's Office, of Elgin, for appellant. |
| | |
| | Louis A. Bianchi, State's Attorney, of Woodstock (Lawrence M. Bauer and Jay Paul Hoffmann, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| | |
| Panel | JUSTICE SCHOSTOK delivered the judgment of the court, with opinion. |
| | Justice Burke concurred in the judgment and opinion. |
| | Justice McLaren specially concurred in the judgment, with opinion. |

**OPINION**

¶ 1      After a jury trial, defendant, Amanda K. Coots, was convicted of drug-induced homicide (720 ILCS 5/9-3.3(a) (West 2008)), based on the death of Rustin Cawthon from heroin, and was sentenced to 10 years' imprisonment. On appeal, she contends that (1) she was not proved guilty beyond a reasonable doubt, because the evidence showed at most that she and Cawthon jointly possessed the fatal heroin, not that she "deliver[ed]" (*id.*) it to him; and (2) her attorney was ineffective for failing to request a supplemental instruction, based on the joint possession theory, in response to the jury's question about the meaning of "delivery." We reverse and remand for a new trial.

¶ 2      The indictment against defendant alleged that she knowingly delivered a substance containing heroin, a controlled substance, to Cawthon, in violation of section 401 of the Illinois Controlled Substances Act (720 ILCS 570/401 (West 2008)), and that Cawthon died by ingesting some of the heroin. We summarize the pertinent evidence at trial.

¶ 3      Neil Patel testified as follows. On Friday, June 5, 2009, he managed the Super 8 Motel in McHenry. That evening, defendant and Cawthon checked into a room. The next day, at about 11 a.m., she and Cawthon checked out and left in a cab. At about 12:30 p.m., they returned and rented room 119. On Sunday, at about 10:45 a.m., housekeeper Leticia Cortez knocked on the door to room 119. Receiving no response, she opened the door and saw Cawthon sitting in a chair. Cortez left and told Patel what she had seen. Patel called the room, got no response, then went to the room and opened the door. Cawthon was not moving. Patel called the police.

¶ 4      McHenry police officer Derrick Kay testified that, shortly after 11 a.m. on June 7, 2009, he arrived at room 119. Cawthon was lying motionless in a recliner; foam had accumulated around his mouth and nose. Nobody else was there until medical personnel and Detective Marc Fisher entered.

¶ 5 Kimberly Bostic, a McHenry County deputy coroner, testified as follows. At about 11:32 a.m. on June 7, 2009, she arrived at room 119 and examined Cawthon's body. Rigor mortis had set in. Bostic explained that rigor mortis sets in about 10 to 12 hours after death and starts to reverse itself about 24 to 36 hours after death. Bostic could not determine precisely when Cawthon died. Cawthon's body was taken to the county morgue, where Bostic helped Dr. Mark Peters perform the autopsy. Peters testified that fluid samples from the laboratory established that Cawthon had died from the adverse effects of heroin.

¶ 6 Joane Kurth, a taxi driver, testified that, on June 6, 2009, at about 11:30 a.m., she picked up defendant and Cawthon at the Super 8. Kurth drove to a bank in Wauconda, where Cawthon exited. Five minutes later, he returned and told defendant that he had withdrawn $1,000 from his account. Kurth then returned to the Super 8, dropping defendant and Cawthon off at 12:30 or 1 p.m. At about 4:15 p.m., Kurth returned to the Super 8, where she picked up defendant, who was alone. Kurth drove her to a subdivision in Wauconda.

¶ 7 The trial court admitted a copy of a statement that defendant gave Fisher on June 8, 2009. It related the following. On the afternoon of Friday, June 5, 2009, Cawthon called her and asked whether she wanted to get a hotel room and "party." She agreed, so they got a ride, picking up beer along the way. Next, they checked into the Super 8, drank beer in their room, and went to sleep. On Saturday, at 11 a.m., they took a cab to Cawthon's bank, where he withdrew $1,000 and suggested that they "party" with heroin. Defendant said that she was not sure whether she could get heroin. They returned to the Super 8 and got another room. At Cawthon's request, defendant made some calls, but with no luck. At about 3 p.m., she called "A.J." for the third time; A.J. said that he could deliver six bags of heroin for $100 and would be there within an hour. At 3:30 or 4 p.m., defendant decided to take a cab home to shower and change, because she had no clean clothes at the motel. The cab arrived at about 4 p.m. A.J. had not shown up yet. At about 4:30 p.m., defendant got home, showered, and ate. She called room 119 to tell Cawthon that she did not have a ride back to the motel, but nobody answered. At about 8 p.m., she went to sleep.

¶ 8 Detectives Fisher and Ryan Sciame interviewed defendant at the police station on August 4, 2009. The trial court played the videotape for the jury. We summarize the tape.

¶ 9 Initially, defendant gave Fisher and Sciame approximately the same account as in her written statement. She said that, on the afternoon of June 6, 2009, she called several possible drug suppliers; that she called A.J. about an hour or an hour and a half after she checked into room 119, telling him that, if she were not there to meet A.J., Cawthon would be; and that she left the motel at about 3:30 or 4 p.m., before A.J. showed up. The detectives expressed doubt that she had left before A.J. showed up. They noted that phone records proved that A.J. had been at the Super 8 before defendant left. Further, the evidence of when Cawthon went into rigor mortis proved that he was already dead when defendant left. Defendant then changed her story.

¶ 10 Defendant told the detectives that A.J. "brought up the shit" and dropped it off, although she could not remember exactly when. Sciame told defendant that she had said she left the motel at 4 p.m., and he asked how long before then A.J. had dropped off the heroin. She responded, "probably an hour, tops." After A.J. left, Cawthon told defendant that he wanted

-3-

to "go first." Defendant, who had brought along only one needle, acquiesced. Cawthon, who was sitting on the bed, ingested the first bag. As defendant was using her first two bags simultaneously, Cawthon complained that he was not high, and he asked for another bag. Defendant told him, "You need to just wait." Defendant estimated that she waited 10 to 15 minutes. During that time, Cawthon "kept begging and begging."

¶ 11        Defendant told the detectives, "I had the bags in my pocket, so I wasn't going to give it to him." Cawthon kept "begging," so she said, "All right, Rusty, whatever. You're a grown man, you do what you've got to do." Defendant explained, "it was his money, he paid for it." She gave him another bag. She then threw her one needle into the garbage, took her cooker, and left.

¶ 12        Defendant next said that, on June 6, 2009, she and Cawthon arrived at room 119 between 1:30 and 2 p.m. Shortly afterward, A.J. "came in, gave it to me, and walked back out." He was there about five minutes, leaving at about 2:30 p.m. Defendant left the motel between 3:30 and 4 p.m.

¶ 13        The interview returned to defendant's and Cawthon's use of the heroin. Defendant said that Cawthon sat at the desk against the wall and used defendant's needle to inject one bag. Five minutes later, he started "bitching" that he was "not even high," and he asked defendant for "another one." Defendant told him to "wait a little bit." Five minutes later, Cawthon complained again that he was "not high." He "bitched for maybe 5 or 10 minutes" while defendant was finishing her first two bags. When she was done, she "gave him the bag." Cawthon injected the second bag while sitting on the bed, then got up and sat in the chair.

¶ 14        In closing arguments, the parties focused on whether the evidence proved that defendant had "deliver[ed]" (720 ILCS 5/9-3.3(a) (West 2008)) heroin to Cawthon. The State contended that defendant was guilty because she "gave Rustin Cawthon heroin" that killed him. The heroin "went from [defendant's] hand into Rustin Cawthon's bloodstream by injecting it with the rig that [defendant] gave to him." That Cawthon paid for the heroin did not negate defendant's guilt. More important was that defendant, not Cawthon, had a supplier–A.J.–and she called him repeatedly to obtain heroin. Also, she gave Cawthon one bag, lent him her needle to ingest it, and then removed another bag from her pocket and handed it to Cawthon. The heroin that defendant removed from her control and gave Cawthon contributed to his death, making her guilty of drug-induced homicide.

¶ 15        In response, defendant's attorney observed that the decision to "party" originated with Cawthon and that Cawthon used his money, not hers, to obtain the heroin. Defendant's attorney told the jury that defendant and Cawthon were both "consumers of heroin" who were "at the bottom of the food chain in the heroin distribution cycle." In rebuttal, the State countered that, according to the evidence, defendant had called A.J., arranged the purchase, and given Cawthon both the heroin and the needle that he used to consume it.

¶ 16        During deliberations, the jury sent the judge a note reading, "With respect to the definition of the term 'delivery,' may the jury reasonably interpret the term to mean 'give[?]' " The judge proposed "to refer the jury to their jury instructions." The prosecutor and defendant's attorney agreed. The judge wrote to the jury, "Please refer to your jury instructions." The jury convicted defendant. The court denied her motion for a new trial and

sentenced her to 10 years' imprisonment. She appealed.

¶ 17    On appeal, defendant contends first that she was not proved guilty beyond a reasonable doubt, because the evidence did not allow the jury to find that she "unlawfully *deliver*[ed]" (720 ILCS 5/9-3.3(a) (West 2008)) the heroin that caused Cawthon's death. (Emphasis added.) Relying on a line of foreign case law that appears to have originated with *United States v. Swiderski*, 548 F.2d 445 (2d Cir. 1977), defendant contends that the evidence proved only that she and Cawthon jointly possessed the heroin and that their status as joint possessors meant that she was not guilty of delivering the heroin to Cawthon.

¶ 18    In considering a challenge to the sufficiency of the evidence, we ask only whether, after viewing all of the evidence in the light most favorable to the State, any rational fact finder could have found the elements of the offense proved beyond a reasonable doubt. *People v. Ward*, 154 Ill. 2d 272, 326 (1992); *People v. Hill*, 272 Ill. App. 3d 597, 603-04 (1995). The trier of fact is responsible for determining the witnesses' credibility, weighing their testimony, and deciding on the reasonable inferences to be drawn from the evidence. *People v. Lamon*, 346 Ill. App. 3d 1082, 1089 (2004).

¶ 19    Whether defendant's conduct fit within the statute turns not only on what facts the jury could reasonably have found, but also on the legal effect of those facts. Therefore, we must construe the drug-induced-homicide statute, specifically the language "delivering a controlled substance to another." 720 ILCS 5/9-3.3(a) (West 2008). To begin, we discuss *Swiderski* and related authority.

¶ 20    In *Swiderski*, the court framed the issue as "whether joint purchasers and possessors of a controlled substance, who intend to share it between themselves as users, may be found guilty of the felony of possession 'with the intent to distribute' " under the pertinent federal statute. *Swiderski*, 548 F.2d at 447. The evidence, viewed most favorably to the prosecution, showed the following. Swiderski arranged to buy cocaine from Davis. A few days later, Swiderski and De Los Santos, his fiancée and codefendant, picked up Davis in Swiderski's van, showed him a large sum of cash, and drove to an apartment. There, Bush, a supplier whom Davis had found, gave Swiderski cocaine. Swiderski and De Los Santos both sampled it. She said that it was not good enough for their personal use, but they had a buyer who would take it; Swiderski paid Bush $1,250 and put the cocaine into his pocket. They drove off with Davis. Drug enforcement agents stopped Swiderski's van and arrested the defendants. Searches revealed that Swiderski had $529 cash in his pocket; De Los Santos had $3,100 cash and the cocaine in her purse. *Id.* at 447-48.

¶ 21    The government argued to the jury that the defendants were guilty of possession with the intent to distribute even if they had bought the cocaine intending solely to share it between themselves as users. During deliberations, the jury asked the trial court whether, had both defendants possessed the cocaine, intent to distribute could " 'mean giving the drug to the other[,] or must third parties be involved?' " *Id.* at 449. The judge instructed the jury that distribution could be satisfied solely by a transfer from one defendant to the other. The jury found both defendants guilty. *Id.*

¶ 22    The court of appeals reversed. It observed that the statute defined "distribute" as "deliver," which in turn was defined as to "transfer." *Id.*; see 21 U.S.C. § 802(8), (11) (2006).

The court then sought to place the statute into "the statutory drug enforcement scheme as a whole, which draws a sharp distinction between drug offenses of a commercial nature and illicit personal use of controlled substances." *Swiderski*, 548 F.2d at 449. Congress had intended to penalize the former more severely than the latter, because commercial trafficking "tends to have the dangerous, unwanted effect of drawing additional participants into the web of drug abuse." *Id.* at 450. However:

> "[W]here two individuals simultaneously and jointly acquire possession of a drug for their own use, intending only to share it together, their only crime is *** simple joint possession, without any intent to distribute the drug further. Since both acquire possession from the outset and neither intends to distribute the drug to a third person, neither serves as a link in the chain of distribution. For purposes of the [federal statute,] they must therefore be treated as possessors for personal use rather than for further distribution." *Id.*

¶ 23    Unlawful delivery did not include "the exchange of physical possession between two persons who jointly acquired and hold the drug for their own use." *Id.* Thus, the trial court had erred in instructing the jury that either defendant intended to deliver the cocaine even if he or she planned only to give it to the other one. The court reduced the convictions to simple possession. *Id.* at 452.

¶ 24    In *People v. Edwards*, 702 P.2d 555 (Cal. 1985), which did not rely on *Swiderski*, the defendant was convicted of furnishing and/or administering heroin and second-degree murder. The victim was his girlfriend, Rogers. The evidence showed that, at a bar, one Royce told the defendant and Rogers that he could get heroin for them. The defendant and Rogers agreed with the idea and, along with Royce and a woman, Mullican, drove to a motel. The defendant gave Mullican money. Mullican exited, purchased the heroin, and returned to the car. The foursome drove to Mullican's house. There, she injected both the defendant and Rogers with heroin. Rogers died from an accidental overdose. *Id.* at 557-58.

¶ 25    The California Supreme Court held that the trial court erred in refusing to instruct the jury that the defendant could not be convicted of furnishing heroin to Rogers if he and Rogers were merely co-purchasers of the heroin. (The court also held that the jury should have been instructed on the offense of involuntary manslaughter. This holding was based on the same reasoning as follows.) The court recognized a distinction "between one who sells or furnishes heroin and one who simply participates in a group purchase ***, at least where the individuals involved are truly 'equal partners' in the purchase and the purchase is made strictly for each individual's personal use." *Id.* at 559. The court cautioned that it expected "few cases involving a copurchase by truly equal partners" and that, if one of the purchasers takes a more active role in instigating, financing, arranging, or carrying out the purchase, he might still be guilty of furnishing to the less active one. *Id.* at 559 n.5

¶ 26    The court held that the trial court should have provided the instructions at issue, because the jury reasonably could have found that the defendant and Rogers had been equal partners. There was evidence that (1) Royce instigated the purchase; (2) the purchase money was supplied by both the defendant and Rogers; (3) the defendant and Rogers mutually decided on the purchase; and (4) the defendant and Rogers both actively consummated the purchase.

*Id.* at 559-60.

¶ 27 In *State v. Carithers*, 490 N.W.2d 620 (Minn. 1992), the Minnesota Supreme Court construed a statute making it felony murder to proximately cause the death of another person by furnishing a controlled substance, with "furnishing" defined as, in part, " 'delivering *** distributing or administering." *Id.* at 620 (quoting Minn. Stat. § 609.195(b) (1990)). In separate cases, each of the two defendants had purchased a controlled substance, taken it home, and shared the use with his or her spouse, who died. The court held that neither could be convicted under the statute:

> "If a husband and wife jointly acquire the drug, each spouse has constructive possession from the moment of acquisition, whether or not both are physically present at the transaction. The absent spouse could be charged with constructive possession at any time following the purchase by his or her confederate. That the absent spouse did not exercise physical control over the substance at the moment of acquisition is an irrelevancy when there is no question that the absent spouse was then *entitled* to exercise joint physical possession." (Emphasis in original.) *Id.* at 622.

¶ 28 Discussing *Swiderski*, the court allowed that one who acquires drugs on his own, then uses them with another, might come within the statute. However, the cases before the court involved only "joint acquisition and possession of drugs" under circumstances not showing a sale, transfer, or delivery to the victim. *Id.* at 623-24; see also *State v. Lopez*, 819 A.2d 486, 493-94 (N.J. Super. Ct. App. Div. 2003) (citing *Swiderski*, court held that defendant could not be convicted of possession with intent to distribute marijuana merely for having jointly acquired and possessed marijuana with other person solely for their own use).

¶ 29 Not all defendants who have invoked *Swiderski* have succeeded. Several courts have construed its holding narrowly. In particular, they have held that the fact that two or more people have paid for drugs will not prevent one of them from being guilty of delivery or distribution–or intent to deliver or distribute–if he alone obtains the drugs at a separate location and then returns to share their use with his co-purchasers. In *United States v. Wright*, 593 F.2d 105 (9th Cir. 1979), the defendant was convicted of distributing heroin. On appeal, he argued that the trial court should have given the jury an instruction based on *Swiderski*. The court disagreed, holding that *Swiderski*, "even if correct," did not control. *Id.* at 108. Crucial was that, at best, the evidence had shown only that the distributee asked the defendant to buy heroin for both of them to use; that she gave him the money to buy the heroin but did not tell him where to buy it; and that the defendant left her residence and returned, after which he and she enjoyed the heroin together. *Id.* Thus, the defendant had facilitated the transfer of the drug, whereas Swiderski and his co-user had " 'simultaneously and jointly acquire[d] possession of a drug for their [his and another's] own use.' " *Id.* (quoting *Swiderski*, 548 F.2d at 450). In *Wright*, the two co-purchasers had not acquired the drug simultaneously at the same place; rather, by his separate errand, the defendant had "operated as the link between the person with whom he intended to share the heroin and the drug itself." *Id.* Therefore, he had no right to the *Swiderski* instruction. *Id.*

¶ 30 In *State v. Toppan*, 425 A.2d 1336 (Me. 1981), the court, in contrast to the *Carithers* court, rejected a property-rights-based approach to distinguishing delivery from joint

possession. The defendant grew marijuana in a garden on property that he and his wife owned in joint tenancy. The marijuana garden was "a joint enterprise, the product of which was to be enjoyed solely" by the defendant and two friends. *Id.* at 1338. All three had contributed money, seeds, and labor to the production effort. *Id.* at 1337. After the defendant was convicted of unlawfully furnishing marijuana, he appealed. He contended that he had not furnished–*i.e.*, transferred–the marijuana to his fellow venturers, because, from the start, all three had shared ownership and possession of the drug. The court disagreed. Because the possession, transfer, and sale of marijuana were against the law, the business agreement created no rights of ownership or possession. *Id.* at 1339. Therefore, the crucial consideration was that, before the harvest, the defendant had had "practical control" over the marijuana (having owned the farm on which it was grown), so that, by dividing the crop, he transferred "factual control" of some of the drug to his friends. *Id.*

¶ 31    *Long v. United States*, 623 A.2d 1144 (D.C. 1993), followed *Toppan*'s reasoning. The defendant was convicted of possessing heroin with the intent to distribute it. He and several friends had contributed to a fund to purchase heroin to consume among themselves. The defendant took the money, bought the drug on the street, then returned to his apartment, where he started to prepare the heroin but was interrupted by a police raid. On appeal, he contended that he should have been allowed to argue to the jury that his conduct was not distribution or intended distribution under the federal statute. The court of appeals affirmed. Following *Wright*, the court distinguished *Swiderski* as having involved a joint and simultaneous purchase by the co-users, whereas in *Long* the defendant had brought the drugs home to his friends, thus serving as " 'a link in the chain of distribution.' " *Id.* at 1151 (quoting *Swiderski*, 548 F.2d at 450).

¶ 32    Also, following *Toppan*, the court rejected the defendant's argument that his companions, having paid for the heroin, thereby immediately became joint possessors, each with a right to his fair share of the drug. The court reasoned that nobody has a property right in contraband. *Id.* at 1148. Therefore, without recourse to rules that "might prevail if Long had purchased rare books, rice, or roses" (*id.*), the crux of the matter was whether the defendant had had " 'practical control' " of the heroin (*id.* (quoting *Toppan*, 425 A.2d at 1339)). He had. Thus, had he realized his intention to divide the heroin among the co-purchasers, a " 'transfer of factual control' " would have occurred. (Emphasis omitted.) *Id.* (quoting *Toppan*, 425 A.2d at 1339).

¶ 33    Other courts have similarly held that one who obtains drugs on his own and then transfers physical possession to another has committed delivery and not mere joint possession, even if the other person paid for all or part of the contraband and it was purchased solely for use by one or both of them. In *State v. Moore*, 529 N.W.2d 264 (Iowa 1995), the defendant was convicted of delivery of a controlled substance. The evidence showed that he bought and paid for heroin, which he brought home. There, he injected his wife with the drug three times, the first two times with her consent, and the third time against her will. Affirming the conviction, the court held that the defendant had "delivered" the heroin, even if he had done so after his wife had obtained "constructive possession" of it. *Id.* at 266. The court distinguished *Swiderski* as having involved two people who were equally active in the original purchase, having simultaneously acquired drugs for their own use. *Id.* In *Moore*, by

contrast, as in *Wright*, the defendant purchased the drugs by himself and later shared them with another. *Id.*

¶ 34    In *Commonwealth v. Johnson*, 602 N.E.2d 555 (Mass. 1992), the defendant was convicted of trafficking–*i.e.*, unlawful distribution (physical transfer) of cocaine. Affirming, the court held that the trial court properly refused to instruct the jury that, if two or more people contribute to money to buy drugs but only one person carries out the purchase, he is guilty only of possession. *Id.* at 559. *Swiderski* did not apply, being limited to when two or more people simultaneously acquire possession at the outset. *Id.* Instead, *Wright* controlled. *Id.*

¶ 35    The Illinois statute under which defendant was convicted is essentially similar to the foreign statutes at issue in the foregoing cases. The statute centers on "unlawfully delivering a controlled substance to another" (720 ILCS 5/9-3.3(a) (West 2008)), with "delivering" being defined as "the actual, constructive or attempted transfer of possession of a controlled substance, with or without consideration, whether or not there is an agency relationship" (720 ILCS 570/102(h) (West 2008); see *People v. Boand*, 362 Ill. App. 3d 106, 141 (2005)). There is little case law in Illinois applying this language, so we turn to the foregoing foreign cases in deciding both whether defendant was proved guilty beyond a reasonable doubt and whether her trial counsel was ineffective for failing to request an instruction in response to the jury's question about the meaning of "delivering."

¶ 36    The case law that we have discussed is not wholly consistent, but we can say that it addresses two paradigmatic situations. One is when the defendant and the co-user "*simultaneously and jointly acquire* possession of a drug for their own use, intending only to share it together." (Emphasis added.) *Swiderski*, 548 F.2d at 450. In that situation, regardless of whether any legal rights of possession can be said to have accrued, the co-purchasers are, from the outset, in "joint possession" (in the criminal-law sense) with no intention of distributing the illicit substance to a third party. *Id.* Under *Swiderski*, the defendant is guilty not of delivery but merely of possession. We follow *Swiderski* (and *Lopez*) to the extent that we hold that joint and simultaneous acquisition of contraband, *in itself*, will not support a conviction of drug-induced homicide. There must be something more than "a copurchase by truly equal partners." *Edwards*, 702 P.2d at 559 n.5.

¶ 37    The other paradigmatic situation, presented in *Toppan*, *Wright*, *Moore*, *Johnson*, and *Carithers*, arises when the defendant separately procures the drug in the absence of the co-user (and perhaps co-purchaser), then physically transfers possession to the co-user, with no intent to convey any to a third party. In that situation, all of the mentioned opinions except *Carithers* hold that the defendant is guilty of delivery and is not merely a joint possessor. We agree: not only are *Swiderski*'s language and facts limited to would-be users who "jointly and simultaneously acquire possession" (*Swiderski*, 548 F.2d at 450), but, when one person acquires the drug himself, then physically transfers possession to another, he has "operated as [a] link between the person with whom he intended to share the [drug] and the drug itself" (*Wright*, 593 F.2d at 108). In that situation, the co-users are not "truly equal partners," because one has taken "a more active role in *** carrying-out [*sic*] the drug transaction." *Edwards*, 702 P.2d at 559 n.5.

¶ 38    *Carithers* rejects the narrow reading of *Swiderski*, holding that even one who separately procures and then transfers drugs to a co-purchaser is not guilty of delivery. We find *Carithers* unsound. Aside from departing from the weight of authority, *Carithers* imports notions of property rights and legal ownership into the realm of contraband, reasoning that, even if one prospective user acquires the drugs on his own, the other prospective user is "immediately *entitled* to exercise joint physical dominion and control or actual physical possession over [*sic*] those drugs at all times following the completion of the sale." (Emphasis added.) *Carithers*, 490 N.W.2d at 622.

¶ 39    Like the courts in *Toppan* and *Long*, we do not understand how anyone can become "entitled" to exercise dominion over something that cannot legally be possessed. An "entitlement" to possess contraband is a contradiction in terms. Of course, the absence of any legal right to possess contraband does not negate the concept of possession, including joint possession of contraband–in the sense that *the criminal law* uses these terms. And the absence of any legal right to possess the contraband does not render irrelevant a defendant's subjective beliefs about a co-user's rights–because even legally unfounded subjective beliefs may be relevant to the existence of joint possession at a given moment, and that in turn bears on the question of delivery.

¶ 40    We turn to the case at hand. The first thing to observe is that, given the facts that are not in dispute, this case does not fit neatly within either *Swiderski* or the *Wright* line of cases. There was evidence that defendant and Cawthon both participated actively in procuring the heroin. Cawthon originated the idea, and he paid for the heroin. However, defendant actually made the calls, located a supplier, and ordered the drug. When A.J. delivered the heroin, defendant did not go separately to pick it up. Instead, she and Cawthon were present together for the delivery. However, A.J. did not give the heroin to both of them or leave it in a mutually accessible area. Rather, he gave it to defendant, who put it into her pocket.

¶ 41    Most of the pertinent evidence appears to be undisputed. But, even so, we conclude that the resolution of the trial depended on debatable inferences going to the interrelated questions of "practical control" and joint possession–and thus to the ultimate issue of whether any physical transfer of heroin from defendant to Cawthon was a *delivery*. Put simply, we hold that the evidence allowed a reasonable jury either to convict or to acquit defendant.

¶ 42    Under *Swiderski*, that two co-purchasers jointly acquire and possess drugs for their sole personal use is insufficient, in itself, to convict either one of delivering the drugs to the other. Defendant contends that, even viewed most favorably to the State, the evidence showed no more than such joint possession at all pertinent times. We do not agree. Either the existence *or* the nonexistence of joint possession at a pertinent time could have been found by a reasonable jury. This is because the question of joint possession may turn on what inferences to draw about the two co-users' intent.

¶ 43    A person possesses drugs when he knows of their presence and they are in his immediate and exclusive possession or control. *People v. Schmalz*, 194 Ill. 2d 75, 81 (2000). Although possession must be "exclusive," it may simultaneously be joint. *Id.* at 82. "[I]f two or more persons share immediate and exclusive control *or share the intention and power to exercise*

*control*, then each has possession [citation]." (Emphasis added.) *Id.* We note that the designation of "control" as a necessary element of possession parallels the *Toppan* line of cases' use of "practical control" as the key to distinguishing a deliverer from a mere joint possessor.

¶ 44 Here, a rational fact finder could conclude that Cawthon's second bag of heroin caused his death and that, immediately before removing the bag from her pocket, defendant alone possessed it. A rational jury could–which is not to say need–infer that, immediately before the transfer, defendant had the "practical control" of the heroin and that she, but not Cawthon, intended to exercise control over what happened to it. At least some of defendant's own words to the detectives support this inference. Most notably, she told them, "I had the bags in my pocket, so I wasn't going to give it to him." A permissible further inference, that Cawthon recognized defendant's subjective right to control whether and when he received his second bag, would enable the jury to conclude that, even had there been joint possession at some prior point, that was no longer the situation. Based on this reading of the parties' intentions, a rational jury could find defendant guilty of delivering the fatal heroin and not merely possessing it jointly with Cawthon.

¶ 45 Of course, we recognize that, under the standards that we adopt, a rational jury might resolve the question of delivery versus joint possession in defendant's favor. Surely, much of what defendant told the detectives could be read this way, *e.g.*, "it was his money, he paid for it." The jury had to weigh both the credibility and the implications of defendant's varied and perhaps inconsistent remarks to the detectives. In short, this was a close and difficult case on the facts. Further, we recognize that the jury, with no guidance on the meaning of "delivery" in the drug-induced-homicide statute, might well have given that term a broader meaning than it deserves, to the prejudice of defendant. Therefore, we agree with defendant that her trial counsel was ineffective for failing to request that the trial court answer the jury's question and, more specifically, for failing to tender an instruction that would have limited the definition of "delivery."

¶ 46 We do not fault trial counsel for failing to anticipate our holding. Also we acknowledge that, in closing argument, he invoked the delivery-is-not-joint-possession theory indirectly, emphasizing that both defendant and Cawthon had actively pursued the purchase of heroin and contending that both had been mere "consumers of heroin" who were "at the bottom of the food chain in the heroin distribution cycle." Nonetheless, we conclude that counsel's failure to submit a proposed supplemental instruction on the meaning of "delivery" was objectively unreasonable and, given the closeness of the evidence, prejudiced defendant.

¶ 47 To succeed on a claim of ineffective assistance of counsel, a defendant must demonstrate that (1) counsel's performance was objectively unreasonable; and (2) it is reasonably probable that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984); *People v. Evans*, 369 Ill. App. 3d 366, 383 (2006). Here, during deliberations, the jury asked the trial court whether it could reasonably interpret the term "delivery" to mean "give." The trial judge decided not to answer the question, and defendant's counsel acquiesced in this decision. Both the judge and defendant's counsel erred; the question should have been answered directly, and the lack of an answer may well have resulted in a conviction based

on legally insufficient factual findings.

¶ 48    "[T]he general rule is that the trial court has a duty to provide instruction to the jury where it has posed an explicit question or requested clarification on a point of law arising from facts about which there is doubt or confusion." *People v. Childs*, 159 Ill. 2d 217, 228-29 (1994). "This is true even though the jury was properly instructed originally." *Id.* at 229.

¶ 49    Reversible error can occur when the jury asks the trial court to define a key term used in the instructions but the court refuses the request. Thus, in *People v. Brouder*, 168 Ill. App. 3d 938 (1988), the defendant was charged with resisting arrest, which required the State to prove that he had " 'knowingly resisted' " arrest. *Id.* at 941. During deliberations, the jury requested a clarification of the term " 'knowingly.' " *Id.* at 946. The defendant's attorney tendered a proposed definition, but the trial judge reserved his ruling on the request. Before the judge could respond to the request, the jury convicted the defendant. *Id.* at 947. On appeal, the court held that the trial court erred in refusing to clarify the statutory term, because the jury's confusion impaired its ability to apply the law properly to the facts. *Id.* at 948; accord *People v. Lowry*, 354 Ill. App. 3d 760, 765-67 (2004) (trial court erred reversibly in refusing jury's request for definition of "knowingly" as used in aggravated battery charge, and defendant's counsel was ineffective for failing to offer definition).

¶ 50    In *People v. Kamide*, 254 Ill. App. 3d 67 (1993), the defendant was charged with driving with a blood-alcohol concentration of 0.10 or more. The jury asked the court whether the term "alcohol" included the type that had been present in the drug that the defendant inhaled to treat his asthma. The trial court declined to answer the question, and the defendant was convicted. On appeal, we held that the refusal was reversible error: the jury had expressed confusion on a question of law, and the trial court could have cleared up the confusion by instructing the jury that the defendant's asthma medicine was not "alcohol" within the meaning of the statute. As it was, the jury might have convicted the defendant without actually having found facts sufficient to establish his guilt under the statute. *Id.* at 71-72; see also, *e.g.*, *People v. Landwer*, 279 Ill. App. 3d 306, 316 (1996) (where defendant relied on defense of entrapment, trial court reversibly erred in refusing to address jury's confusion about meaning of term " 'originated' " in entrapment instruction, as it created danger that jury would reject defense because it misunderstood the law); *People v. Crockett*, 314 Ill. App. 3d 389, 404 (2000) (where defendant's defense was that he did not participate in charged offenses but was mere spectator, trial court was obligated to answer jury's request to define " 'abet,' " used in instructions, as refusal to clarify term risked allowing conviction based on innocent conduct).

¶ 51    In this case, the trial court's refusal to clarify the jury's confusion over the meaning of "delivery"–obviously the linchpin in this case–created a serious danger that the jury would (and did) convict defendant based on facts that were legally insufficient to establish delivery under the drug-induced-homicide statute. Of course, as defendant concedes, it is difficult to hold that the trial court reversibly erred when defendant acquiesced in the mistake. But we agree with her that counsel's failure was both objectively unreasonable and prejudicial.

¶ 52    Indeed, the situation here is strikingly similar to that in *Swiderski*. There, the jury asked the trial court, in essence, whether a defendant could "distribute" the cocaine merely by

giving it to his or her codefendant for the other's personal use. *Swiderski*, 548 F.2d at 447-48. The court held that the trial court's answer–yes–was reversible error, because mere giving was not distribution. *Id.* at 452.

¶ 53    Here, similarly, the jury asked whether "delivery" could mean "give." Thus, not only was the jury confused about a question of law, but it was at least entertaining the belief that defendant could be found guilty for doing no more than handing heroin to Cawthon (which, of course, it is uncontroverted that she did). This danger might have been heightened by the State's closing argument, in which it contended that defendant was guilty because she "gave Rustin Cawthon the heroin" and because the heroin "went from [defendant's] hand into Rustin Cawthon's bloodstream by injecting it with the rig that [defendant] gave to him." In any event, given the extreme closeness of this case, the danger that the jury might have believed that it could find that defendant "delivered" the fatal heroin to Cawthon merely by handing it to him denied defendant a fair trial.

¶ 54    We agree with defendant that her attorney should have requested that the trial court answer the jury's question. Further, we agree with defendant that, to avert the danger of a conviction based on an error of law, her attorney should have tendered, and the court should have given, two pattern instructions that would have clarified the term "deliver." See Illinois Pattern Jury Instructions, Criminal, No. 17.05A(1), (2) (4th ed. 2000) (defining "deliver" as "to transfer possession or to attempt to transfer possession" and saying that "possession" includes constructive possession); Illinois Pattern Jury Instructions, Criminal, No. 4.16 (4th ed. 2000) (defining "possession"). We note that the trial court gave only the third part of the instruction defining "deliver," stating that a delivery does not require money or other consideration, but it did not give the first two parts of the instruction. Defendant's attorney should have requested, and the court should have given, the entire instruction.

¶ 55    Because defendant's trial counsel was ineffective, defendant is entitled to a new trial.

¶ 56    For the foregoing reasons, the judgment of the circuit court of McHenry County is reversed, and the cause is remanded for a new trial.

¶ 57    Reversed and remanded.

¶ 58    JUSTICE McLAREN, specially concurring.

¶ 59    I specially concur because I disagree with one aspect of the majority analysis. The majority relates: "Like the courts in *Toppan* and *Long*, we do not understand how anyone can become 'entitled' to exercise dominion over something that cannot legally be possessed. An 'entitlement' to possess contraband is a contradiction in terms." *Supra* ¶ 39.

¶ 60    I believe that the concept of dominion and control relates to the understanding between the parties that they are "entitled" to exercise dominion and control. Whether the understanding is based upon a joint venture, the contemplation or threat of force, or some other abstruse concept, it is not required that legally consistent concepts of dominion and control be the *sine qua non*. See *People v. Drake*, 288 Ill. App. 3d 963, 969 (1997) ("Where two or more people share immediate and exclusive control or share the intention and power

to exercise control, there arises a situation of joint possession. [Citation.] Even where there is no physical possession, constructive possession may exist where there is an intent and capacity to maintain control and dominion over the contraband, and this may be proved by showing that the defendant controlled the premises where it was found.").

¶ 61       Were I to accept the majority's perception that "entitlement" to possess contraband is a contradiction in terms, it would seem to me that the State would be hard-pressed to ever convict a person of simultaneously possessing contraband with another person, and the concept of "joint possession" would prove to be an oxymoron.