# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*People v. Kidd*, 2013 IL App (2d) 120088

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JASON E. KIDD, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-12-0088 |
| Filed | September 25, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a prosecution for drug-induced homicide, the trial court did not err in rejecting the instruction on proximate cause tendered by defendant, but his counsel was ineffective in failing to tender the pattern instruction defining "delivery," especially in view of the questions that existed concerning what drugs, if any, defendant delivered to the victim and the circumstances of any delivery, since there was a reasonable probability that a properly instructed jury could have found defendant not guilty; therefore, defendant's conviction was reversed and the cause was remanded for a new trial. |
| Decision Under Review | Appeal from the Circuit Court of Kendall County, No. 11-CF-140; the Hon. John A. Barsanti, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on
Appeal

Thomas A. Lilien and Paul Alexander Rogers, both of State Appellate Defender's Office, of Elgin, for appellant.

Eric C. Weis, State's Attorney, of Yorkville (Lawrence M. Bauer and Sally A. Swiss, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE McLAREN delivered the judgment of the court, with opinion. Justices Schostok and Spence concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, Jason E. Kidd, was indicted on one count of drug-induced homicide (720 ILCS 5/9-3.3(a) (West 2010)) "by knowingly delivering cocaine, a controlled substance to Merrideth [*sic*] M. Castro and [she] thereafter inhaled or ingested a portion of the cocaine into her body and said inhalation or ingestion of cocaine caused [her] death." Following a jury trial, defendant was convicted and sentenced to a term of 10 years' imprisonment and 3 years' mandatory supervised release. He timely appealed.

¶ 2    Defendant contends that the trial court erred in refusing his tendered jury instructions and that he received ineffective assistance of counsel. We determine that defendant's first issue lacks merit; however, his second issue is meritorious and, therefore, we reverse defendant's conviction and remand for a new trial.

¶ 3                        I. BACKGROUND

¶ 4    On March 7, 2010, defendant found his girlfriend, Meredith Castro, facedown on an upstairs bedroom floor. He rolled her over and immediately realized that she was dead. He called the police.

¶ 5    Alex Silva, an Oswego fire department paramedic, testified that he and his partner were dispatched to a townhouse in Oswego in response to a call of an unconscious or unresponsive person. Upon arriving at the townhouse, Silva and his partner were met by defendant, who said that Castro was upstairs and was not breathing. Silva and his partner found her lying faceup on the floor, unresponsive, with no pulse, and not breathing. After confirming that she had no heart activity, respiration, or pulse, they told defendant that Castro was deceased. Silva testified that defendant was upset.

¶ 6    Defendant told Silva that he and Castro had used cocaine on the previous day. He also told Silva that Castro had chronic obstructive pulmonary disease (COPD), congestive heart failure, and other cardiac issues, and that she took insulin and other medications. Silva then

contacted a nearby hospital and received a "pronouncement" of death, which is different from a time of death. Silva and his partner alerted the coroner's office and then left the scene.

¶ 7    Officer Matthew Unger, of the Oswego police department, testified that he and his partner were called to a townhouse in the early morning of March 7 to assist paramedics with a "possibly deceased person." When he arrived between 6:30 and 7 a.m., he went upstairs and saw Castro lying faceup on a bedroom floor. She was not breathing and had no pulse or heart activity. He stated that "[w]hen we were assessing her, we noticed that she was stiff." He then went downstairs and spoke with defendant in the living room. Defendant stated that he had lived with Castro in the townhouse for two years. The previous day, Castro was upset because her cat had died. Defendant told Unger that in the evening he and Castro had consumed "powder cocaine" and marijuana, then watched a movie together. Castro went upstairs to bed between 10 and 11 p.m. Defendant stayed downstairs and slept on the couch. Around 6:30 a.m. he went upstairs and found Castro on the floor in the bedroom. Defendant told Unger that he vomited after he found Castro, and then he called the police. Defendant told Unger that Castro had congestive "heart failure, COPD, high blood pressure, and diabetes."

¶ 8    Detective Rob Sherwood, of the Oswego police department, testified that he was the "on-call investigator" on March 7, 2010, and responded to a call for a "suspicious death investigation" at a residence. He arrived around 8 a.m. The scene had already been processed, so he made arrangements to interview defendant at the police station. Defendant was not under arrest. The interview was recorded and a video recording and a transcript were admitted into evidence and published to the jury.

¶ 9    During the interview, defendant told Sherwood that Castro wanted to get cocaine because she was upset that her cat had died. Defendant admitted to smoking marijuana almost daily, and he stated that Castro knew about his drug use. Defendant stated that Castro had used cocaine frequently in the past but had not used it for about a year. He stated that "last night she said, 'Go get me a bag of cocaine.' " He then stated that he "went to the bar, got us a bag, we went home. We did it. And we smoked pot."

¶ 10    On cross-examination, Sherwood stated that he did not ask specific questions about the drug transaction at the bar, such as whether anyone was with him or where the money for the drug purchase came from.

¶ 11    Officer Chad Vargas, an investigator with the Oswego police department, testified that on May 9, 2011, he and Sherwood arrested defendant for drug-induced homicide. After giving defendant his *Miranda* warnings, they interviewed him at the police station. A transcript of the interview was admitted into evidence and published to the jury. Defendant stated that, after he returned from disposing of Castro's deceased cat, she said "let's get a bag [of cocaine]." She went to an ATM for cash. At first defendant stated that they could have gone to one of three bars, or they could have had the cocaine delivered. Vargas reminded him that in the previous interview in March 2010 defendant stated that they went to one bar and then returned home and snorted the cocaine. When asked if the purchase was at one particular bar, defendant responded, "uh-huh." Defendant also told Vargas that Castro possessed morphine, Xanax, and Vicodin and that she sometimes smoked "crack" cocaine.

¶ 12    Dr. John Denton, a forensic pathologist, performed an autopsy on Castro on March 9, 2010. Castro was 5 feet 2 inches tall and weighed 260 pounds. He testified that the settling of her blood indicated that she had been placed on her back "soon after death." Castro's lungs were "heavy or congested" with blood but she did not have blood clots, pneumonia, asthma, COPD, emphysema, or cancer. Her heart was enlarged and her main arteries were partially ("moderately") blocked. Her liver was fatty and enlarged, which Dr. Denton opined was "related to her obesity and diabetes." Her brain was swollen. The toxicology report noted evidence of morphine consumption, at 290 nanograms per milliliter. According to Dr. Denton, this is an elevated level. He stated that over 100 nanograms is "a potential cause of death." Dr. Denton testified that, while cocaine is a stimulant, morphine is a narcotic that, as a sedative, leads to respiratory depression. He opined that hypoxia (deficiency of oxygen reaching body tissues) caused by "cocaine and opiate intoxication" was the cause of death. There was no way to determine which drug was ingested first or whether they were ingested at the same time.

¶ 13    Dr. James O'Donnell, an associate professor of pharmacology at Rush Medical College, testified for the defense as an expert on pharmacy and pharmacology. O'Donnell's training included how to study and interpret toxicology results, and he had spent 40 years researching the effects and toxicity of morphine.

¶ 14    Dr. O'Donnell opined that the ratio of cocaine to its metabolite, benzoylecgonine, in Castro's blood was "extremely high," indicating that most of the cocaine in her system had been metabolized. This in turn indicated "a use distant from the time of death." The level of morphine in her blood was a "highly toxic level" that was "lethal." O'Donnell further opined that Castro consumed the morphine sometime after defendant had gone to bed. His opinion was based on the absorption rate of morphine and the level of morphine in Castro's blood as indicated in the toxicology report.

¶ 15    The toxicology report also indicated the presence of the anti-anxiety drug Xanax at a therapeutic level, *i.e.*, "a level that is expected from taking [it] at prescribed doses." O'Donnell testified that, if Xanax and morphine are combined, "the effect of the Xanax enhances the toxicity of the morphine." Alcohol would have the same depressant effect.

¶ 16    Defendant testified on his own behalf. He stated that on the afternoon of March 6, 2010, Castro suggested that they get some cocaine. He and Castro were well known at several bars in the area, and he knew that they would be able to buy cocaine at one of them. They stopped at an ATM where Castro withdrew $120 from her bank account and they then went to a bar where she handed defendant $20 to buy a shot of whiskey for her and a beer for him. He went to the back room and played pool; he did not know if she drank her shot. He stated that Castro went outside and then returned and said, "Let's go." They were at the bar for about 10 minutes. When they got home, she told defendant to roll a "blunt" and then took a bag of cocaine from her bra. She told him it was slightly less than an "eightball" (one-eighth of an ounce). They snorted the cocaine and smoked cannabis over the next three hours. They did not drink any alcohol. During the evening they played video games and watched movies. Between 10:30 and 11:30 p.m., defendant went downstairs and slept on the couch. Castro was awake and alert, and defendant did not notice any unusual behavior.

¶ 17    Between 5:30 and 6 a.m., defendant awoke and walked the dog, then called upstairs to Castro. She did not respond, so he went upstairs and found her lying facedown on the floor. He rolled her over, immediately realized that she was deceased, and vomited. He then called the police. Within minutes the paramedics arrived, and then the police.

¶ 18    Defendant testified that he vaguely remembered talking to Unger. He felt as though his "whole world had fallen apart"; it was traumatic and he was crying. He completed a written statement and then went to the Oswego police department. Sherwood interviewed him at the police station. He was confused by Sherwood's questions.

¶ 19    In May 2011, 14 months later, Sherwood and Vargas arrested defendant and told him that he was being charged with drug-induced homicide. They did not explain the charge. Vargas interviewed him and asked him to summarize what he had told Sherwood in March 2010. Defendant did so as well as he could. He testified that his mind was clearer at the second interview, but he still had trouble recalling some of the events leading up to Castro's death.

¶ 20    Following closing arguments, the trial court instructed the jury on the applicable law. Over defendant's objection, the trial court instructed the jury with Illinois Pattern Jury Instructions, Criminal, No. 7.15 (4th ed. 2000) (hereinafter, IPI Criminal 4th), as follows:

    "In order for you to find that the acts of the defendant or one for whose conduct he is legally responsible caused the death of Meredith Castro, the State must prove beyond a reasonable doubt that defendant's acts were a contributing cause of the death and that the death did not result from a cause unconnected with the defendant. However it is not necessary that you find the acts of the defendant were the sole and immediate cause of death."

¶ 21    Defendant offered a non-IPI jury instruction that read as follows:

    "The term 'proximate cause' means any cause which, in the natural or probable sequence, produced the death. It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it causes the death."

In refusing the tendered instruction, the trial court remarked that IPI Criminal 4th No. 7.15 "adequately describe[d] the proximate cause responsibility the State has and adequately describe[d] the intervening and superseding events and adequately describe[d] the foreseeability."

¶ 22    A second proposed instruction, which was also refused, read as follows:

    "Proximate cause is a cause that directly produces an event and without which the event would not have occurred. Proximate cause is established if Meredith Castro's death was foreseeable as the type of harm that a reasonable person would expect to see as the result of Defendant's conduct."

¶ 23    The jury was also instructed with IPI Criminal 4th No. 7.27, which read, "[a] person commits the offense of drug induced homicide when he knowingly delivers to another a substance containing Cocaine, a controlled substance, *** and any person dies as a result of the ingestion of any amount of that controlled substance."

¶ 24    Also over defendant's objection, the trial court instructed the jury on accountability with

IPI Criminal 4th No. 5.03, as follows:

> "A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of an offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of an offense.
>
> The word 'conduct' includes any criminal act done in furtherance of the planned and intended act."

¶ 25 The trial court also instructed the jury with only the third paragraph of IPI Criminal 4th No. 17.05A. No objection was made by the defense regarding omitting the first two paragraphs, nor did defense counsel submit this instruction in its entirety. The whole instruction reads:

> "The word 'deliver' means to transfer possession or to attempt to transfer possession.
>
> The word 'deliver' includes a constructive transfer of possession which occurs without an actual physical transfer. When the conduct or declarations of the person who has the right to exercise control over a thing is such as to effectively relinquish the right of control to another person, so that the other person is then in constructive possession, there has been a delivery.
>
> A delivery may occur with or without the transfer or exchange of money, or with or without the transfer or exchange of other consideration." IPI Criminal 4th No. 17.05A.

¶ 26 During deliberations, the jury sent a note to the trial court which read: "Request cause of death report from Dr. Denton." In response, the trial court sent "People's Exhibit #7," which was the autopsy report and the toxicology report. The cause of death was listed as "cocaine and opiate intoxication." Thereafter, the jury returned a guilty verdict. Defendant timely appealed.

¶ 27 II. ANALYSIS

¶ 28 A. Tendered Instructions

¶ 29 Defendant first argues that "the conflicting evidence regarding the cause of Castro's death made it imperative for the trial court to give the 'proximate cause' instructions tendered by the defense." Illinois Supreme Court Rule 451 (eff. July 1, 2006) states:

> "(a) Use of IPI Criminal Instructions; Requirements of Other Instructions. Whenever Illinois Pattern Jury Instructions, Criminal, contains an instruction applicable in a criminal case, giving due consideration to the facts and the governing law, and the court determines that the jury should be instructed on the subject, the IPI Criminal instruction shall be used, unless the court determines that it does not accurately state the law."

Our review is *de novo* "because the issue raised concerns whether the jury was provided with the correct legal principles that apply in this case, thereby allowing the jury to reach a proper result based on the applicable law and the evidence." *People v. Walker*, 2012 IL App (2d) 110288, ¶ 18.

¶ 30 As a preface to our discussion of the jury-instruction issue, we point out the following legislative history of the language regarding causation in the drug-induced homicide statute.

In 2005, our legislature attempted to make the statute's definition of cause consistent with that in other homicide statutes. Prior to January 1, 2006, the statute read:

"§ 9-3.3. Drug-induced homicide.

(a) A person who violates Section 401 of the Illinois Controlled Substances Act by unlawfully delivering a controlled substance to another, and *any person dies as a result of* the injection, inhalation or ingestion of any amount of that controlled substance, commits the offense of drug-induced homicide." (Emphasis added.) 720 ILCS 5/9-3.3(a) (West 2004).

Effective January 1, 2006, the language of the statute was amended as follows:

"§ 9-3.3. Drug-induced homicide.

(a) A person who violates Section 401 of the Illinois Controlled Substances Act *** by unlawfully delivering a controlled substance to another, and *any person's death is caused by* the injection, inhalation or ingestion of any amount of that controlled substance, commits the offense of drug-induced homicide." (Emphasis added.) 720 ILCS 5/9-3.3(a) (West 2010).

¶ 31    In the discussion on the House floor regarding the proposed change, Representative Pihos stated that the change was:

"cleanup language. It provides that a person who unlawfully delivers a controlled substance to another and *any person's death is caused by* the injection, inhalation, or ingestion of any amount of that controlled substance, commits the offense of drug-induced homicide. The reason for the change is to provide clarity in the law relating to drug-induced homicide. The causation language is the same as the other homicide language in the law." (Emphasis added.) 94th Ill. Gen. Assem., House Proceedings, Apr. 5, 2005, at 85 (statements of Representative Pihos).

In the Illinois Senate, Senator Sandoval stated: "House Bill 1109 amends the drug-induced homicide Section of the Criminal Code to *extend criminal liability for any deaths caused as a result of unlawful delivery of a controlled substance by* injection, inhalation or [ingestion] ***." (Emphasis added.) 94th Ill. Gen. Assem., Senate Proceedings, May 18, 2005, at 39 (statements of Senator Sandoval). This abbreviated discussion indicates that the legislature intended to change the language so that it mirrored the language of other homicide statutes, which refer to "acts which cause the death" of an individual, whether such act is intentional (720 ILCS 5/9-1 (West 2010) (first degree murder)), negligent (720 ILCS 5/9-2 (West 2010) (second degree murder)), or reckless (720 ILCS 5/9-3 (West 2010) (involuntary manslaughter and reckless homicide)). There does not appear to have been an intent to make a significant change in the underlying meaning of the concept of causation.

¶ 32    We turn to the issue raised on appeal. Defendant offered a non-IPI jury instruction that defined proximate cause as a cause directly producing an event and without which the event would not have occurred. A second instruction offered by defendant stated further that proximate cause was established if Castro's death was foreseeable as the type of harm that a reasonable person would expect to result from defendant's conduct. Defendant argues that he could not have anticipated that the sequence of events would result in Castro's death. However, as the State points out, "foreseeability" does not require that the person charged

with the crime foresee either the extent of the injury (in this case, death) or the exact way in which it occurs (in this case, the ingestion of both cocaine and morphine). See *People v. Cook*, 2011 IL App (4th) 090875, ¶ 18 ("Although the foreseeability of an injury will establish [proximate] cause, the extent of the injury or the exact way in which it occurs need not be foreseeable." (Internal quotation marks omitted.)).

¶ 33    The drug-induced-homicide statute incorporates the "knowing" mental state element from section 401 of the Controlled Substances Act. *People v. Boand*, 362 Ill. App. 3d 106, 142 (2005); see 720 ILCS 570/401(a) (West 2010). Explaining the mental state of "knowingly," the Third District Appellate Court has stated that the defendant "just needs to make a knowing delivery of a controlled substance, and if any person then dies as a result of taking that substance, the defendant is responsible for that person's death." *People v. Faircloth*, 234 Ill. App. 3d 386, 391 (1992). The *Boand* court determined:

> "A person commits drug-induced homicide if he 'violates Section 401 of the Illinois Controlled Substances Act [(the Act) (720 ILCS 570/401 (West 2004))] by unlawfully delivering a controlled substance to another, and any person dies as a result of the injection, inhalation or ingestion of any amount of that controlled substance.' 720 ILCS 5/9-3.3(a) (West 2004)." *Boand*, 362 Ill. App. 3d at 139.

¶ 34    Defendant argues that it was not subjectively foreseeable that Castro would die, because he could not have anticipated Castro's additional ingestion of morphine. The State responds that defendant's knowledge that Castro possessed morphine made it subjectively foreseeable that she might take morphine that night. However, under the proximate-cause theory of criminal liability, liability attaches for any death proximately resulting from the unlawful activity. *Id.* at 142. We agree with the State that the concept of "proximate cause" was adequately explained by the language of IPI Criminal 4th No. 7.15. We are not convinced that the defense instructions would have more fully informed the jury's deliberations; in fact, the proffered instructions seem to confuse the concept of causation with a foreseeable result. Therefore, we conclude that the trial court did not err in refusing defendant's tendered instructions on proximate cause.

¶ 35                    B. Ineffective Assistance of Counsel

¶ 36    Defendant next argues that he was denied the effective assistance of counsel, because defense counsel failed to offer a jury instruction defining the term "delivery." Under *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984), a claim of ineffective assistance of counsel can succeed only if the defendant demonstrates both that: (1) counsel's performance was objectively unreasonable; and (2) it is reasonably probable that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Counsel's performance is measured by "prevailing professional norms." *Id.* at 688. Further, "a reasonable probability that the result *** would have been different is a probability sufficient to undermine confidence in the outcome"; in other words, counsel's deficient performance must have rendered the outcome of the trial "unreliable or fundamentally unfair." (Internal quotation marks omitted.) *People v. Manning*, 241 Ill. 2d 319, 327-28 (2011).

¶ 37     The committee notes for IPI Criminal 4th No. 7.27 state that if the trial court chooses to define the term "deliver," IPI Criminal 4th No. 17.05A should be used. IPI Criminal 4th No. 17.05A, in its entirety, reads as follows:

"The word 'deliver' means to transfer possession or to attempt to transfer possession.

The word 'deliver' includes a constructive transfer of possession which occurs without an actual physical transfer. When the conduct or declarations of the person who has the right to exercise control over a thing is such as to effectively relinquish the right of control to another person, so that the other person is then in constructive possession, there has been a delivery.

A delivery may occur with or without the transfer or exchange of money, or with or without the transfer or exchange of other consideration."

¶ 38     Defendant poses the question of what conduct falls within the legal definition of "delivery." Here, because there was a question for the fact finder as to who actually "possessed" the cocaine, IPI Criminal 4th No. 17.05A should have been given in its entirety. This situation is analogous to that in *People v. Coots*, 2012 IL App (2d) 100592, ¶ 41, where "the ultimate issue" was whether any physical transfer of heroin from the defendant to the deceased was a delivery. In *Coots*, the defendant testified that the deceased originated the idea of procuring heroin and paid for it. On the other hand, the defendant made the calls, located a supplier, and ordered the drugs. They both were present when the supplier delivered the heroin, but the supplier handed it to the defendant, who put it in her pocket.

¶ 39     This court noted that *Coots* was a close and difficult case on the facts and determined that "[e]ither the existence *or* the nonexistence of joint possession at a pertinent time could have been found by a reasonable jury." (Emphasis in original.) *Id.* ¶ 42. This court recognized that the jury, without guidance on the meaning of "delivery" in the drug-induced homicide statute, "might well have given the term a broader meaning than it deserves to the prejudice of defendant." *Id.* ¶ 45. Therefore, this court agreed with the defendant that her trial counsel's failure to tender an instruction that would have limited the definition of "delivery" amounted to ineffective assistance.

¶ 40     Here, the State never alleged that defendant delivered either Xanax or morphine to Castro. Thus, the linchpin of the State's case was that Castro's death directly resulted from defendant's "knowingly delivering cocaine" to her.[1] The State unpersuasively argues that the evidence showed that defendant had exclusive possession of the cocaine until he delivered it to Castro. Defendant's statements in the two interviews with the police and in his testimony at trial were fairly consistent regarding his activities on the afternoon and evening of March 6, 2010. However, a question of fact for the jury was whether Castro and defendant bought the cocaine together or one or the other actually purchased and possessed it. If Castro and defendant jointly possessed the cocaine, there was no delivery. See *Coots*, 2012 IL App (2d) 100592, ¶ 44. The rule that possession must be exclusive does not mean that the

---

[1]An exact time of death was not established, a factor that could have affected the opinions of experts as to the cause of death because, presumably, a more accurate extrapolation of the blood levels of lethal drugs in the toxicology report would have been possible.

possession may not be joint; if two persons share immediate and exclusive control or share the intention and power to exercise control, then each has possession. *People v. Schmalz*, 194 Ill. 2d 75, 82 (2000). Where possession has been shown, an inference of guilty knowledge can be drawn from the surrounding facts and circumstances. *Id.* The fact of possession must be shown beyond a reasonable doubt. *Id.*

¶ 41 As Justice McLaren pointed out in his special concurrence in *Coots*:

"[T]he concept of dominion and control relates to the understanding between the parties that they are 'entitled' to exercise dominion and control. Whether the understanding is based upon a joint venture, the contemplation or threat of force, or some other abstruse concept, it is not required that legally consistent concepts of dominion and control be the *sine qua non*. See *People v. Drake*, 288 Ill. App. 3d 963, 969 (1997) ('Where two or more people share immediate and exclusive control or share the intention and power to exercise control, there arises a situation of joint possession. [Citation.] Even where there is no physical possession, constructive possession may exist where there is an intent and capacity to maintain control and dominion over the contraband, and this may be proved by showing that the defendant controlled the premises where it was found.')." *Coots*, 2012 IL App (2d) 100592, ¶ 60 (McLaren, J., specially concurring).

¶ 42 We believe that, had the jury been properly instructed, there is a reasonable probability that it would have returned a not guilty verdict. Under the *Strickland* test, defendant was prejudiced. Defense counsel should have proffered the instruction regarding delivery in its entirety, and the trial court should have instructed the jury accordingly. We determine that the judgment should be reversed and that defendant should receive a new trial.

¶ 43                                    III. CONCLUSION

¶ 44 For the reasons stated, the judgment of the circuit court of Kendall County is reversed and the cause remanded for a new trial.

¶ 45 Reversed and remanded for a new trial.