2017 IL App (2d) 141143
No. 2-14-1143
Opinion filed June 29, 2017

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 13-CF-1687 |
| JENNIFER N. NERE, | ) ) ) | Honorable Daniel P. Guerin, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE McLAREN delivered the judgment of the court, with opinion.
Justices Zenoff and Schostok concurred in the judgment and opinion.

**OPINION**

¶ 1 After a jury trial, defendant, Jennifer N. Nere, was convicted of drug-induced homicide (720 ILCS 5/9-3.3(a) (West 2012)) and sentenced to nine years' imprisonment. On appeal, she argues that (1) the trial court erred in giving several improper jury instructions and refusing other instructions and (2) she was not proved guilty beyond a reasonable doubt. We affirm.

¶ 2 The drug-induced-homicide statute reads, in pertinent part, "A person who violates Section 401 of the Illinois Controlled Substances Act [(720 ILCS 570/401 (West 2012))] *** by unlawfully delivering a controlled substance to another, and any person's death is caused by the injection, inhalation, absorption, or ingestion of any amount of that substance, commits the offense of drug-induced homicide." 720 ILCS 5/9-3.3(a) (West 2012). Defendant was charged

with committing (1) unlawful delivery of a controlled substance (720 ILCS 570/401(d) (West 2012)) in that, on June 27 or June 28, 2012, she knowingly and unlawfully delivered less than one gram of a substance containing heroin; and (2) drug-induced homicide in that she knowingly delivered heroin to Augustina Taylor and "thereafter Augustina Taylor injected, inhaled, or ingested an amount of that heroin into her body and said injection, inhalation, or ingestion of heroin caused the death of Augustina Taylor."

¶ 3    We summarize the pertinent trial evidence. Wheaton police officers David Schatz and Jim Craig testified that, early on the morning of June 28, 2012, they were dispatched to the apartment of Diane Lockett, Taylor's mother. They forced open the locked bathroom door. Inside was Taylor, lying on the floor, apparently unconscious. Schatz saw a one-inch-by-one-inch baggie and a crack pipe. The officers moved her out of the bathroom. Paramedics, who had arrived in the meantime, administered CPR and took Taylor to the hospital, where she was pronounced dead. The officers reentered the bathroom, photographing and collecting evidence. The evidence included the baggie, the crack pipe, two cigarettes, a cigarette box, a lighter, two tinfoil bindles inside the cigarette box, and a dirty white-gray sock that contained a drug-cooking spoon, a syringe, and a plastic wrapper from the cigarette box. Schatz searched Taylor's personal belongings but found no prescription medicines.

¶ 4    Several members of Taylor's family testified about the circumstances preceding her death. Melanie Taylor (Melanie), her sister, testified on direct examination as follows. On June 26, 2012, she was residing at Lockett's apartment, along with her son, Erik Patterson, and Taylor's four children. That evening, everyone was there to welcome Taylor home from prison. When Taylor arrived that evening, she was in high spirits. The next day, the family had a cookout by the community pool. At about 1 or 2 p.m., Leslie Walker, Taylor's girlfriend, arrived

alone. She and Taylor walked around the pool, talking. In the evening, after the pool closed, Melanie entered the apartment. Taylor and Walker were in the living room; Taylor was braiding Walker's hair. It was about 10:30 p.m. Taylor looked normal. Walker appeared to be asleep.

¶ 5    Melanie testified further that, later that night, she heard Joshua Coakley, Taylor's teenage son, talking on the house phone and knocking on the bathroom door, telling Taylor to get out because Walker wanted to talk to her. Coakley, Melanie, and Kiara, Taylor's daughter, then removed the bathroom doorknob and tried to force the door open. Coakley called the police. They arrived quickly, forced open the door, and carried Taylor into the living room. Taylor was soon taken to the hospital. Melanie went later and learned that Taylor had died.

¶ 6    Melanie testified on cross-examination as follows. Asked whether Taylor and Walker had "go[ne] upstairs for about an hour or two without the rest of the group," Melanie said that she did not so recall. Melanie had told a detective that Taylor and Walker went upstairs at some point, but she did not recall telling him that the two women had been alone for an hour or two. Melanie went inside between 7 and 8 p.m. Although Taylor and Walker did go inside before then, Melanie did not know whether they had then been by themselves; Lockett had gone inside earlier, and other residents of the apartment had been there that day.

¶ 7    Lockett testified as follows. On June 26, 2012, when she welcomed Taylor home, Taylor appeared very happy. The next day, at the barbecue, Walker arrived about 2 p.m., spoke to Lockett, then walked with Taylor around the pool. Lockett went inside about 5 p.m., and Taylor and Walker soon arrived. Taylor was happy and conversed with Lockett; there was nothing unusual about her demeanor.

¶ 8    Lockett testified that Taylor and Walker never went off by themselves that evening. At some point, around 9 or 10 p.m., Lockett, Taylor, and Walker were all sitting in the living room.

Taylor was on the couch next to Lockett, braiding Walker's hair as Walker sat on the floor. Lockett and Taylor were talking; Taylor appeared fine and was happy to be home. Later, Taylor called to get Walker a ride home. Sometime afterward, Taylor said that Walker's ride had arrived, and Taylor and Walker left. Within five minutes, Taylor returned and said that she was going to shower. It was about 11:30 p.m. Taylor entered the bathroom. The phone rang and kept ringing. Lockett, Melanie, and Coakley tried to open the locked door but could only remove the knob. Lockett testified consistently with Melanie about the arrival of the police and paramedics and the eventual trip to the hospital.

¶ 9    Coakley testified on direct examination as follows. On June 26, 2012, at about 8 or 9 p.m., Taylor came home, happy to see her family. The next day, at the barbecue, Taylor appeared happy. When Walker arrived, she and Taylor went for a walk around the pool. Coakley saw them from time to time. About 8:30 or 9 p.m., Coakley returned to the apartment; everyone else appeared to have returned also. In the living room, Lockett and Taylor sat on the couch and Walker sat on the floor as Taylor braided her hair. Taylor was conversing with Lockett and there was nothing unusual about her demeanor or what she was saying. Walker was sleeping.

¶ 10    Coakley testified that, about 11 p.m., Taylor said that Walker's ride had arrived, and the two women left the apartment. A few minutes later, Taylor returned. She was talking, but she was "a little urgent," tugging on her shirt and "in a rush." She was holding two cigarettes. She said that she was going to take a shower. Patterson was in the bathroom, and she told him to get out. Taylor entered the bathroom, dropped the cigarettes into the sink, and closed the door. About 15 minutes passed until Coakley heard the shower go on. The phone rang twice. Coakley saw from caller ID that it was Walker, but he did not answer. The third time the phone rang, he

answered. Walker sounded "urgent" and "in a rush." Coakley hung up, told Lockett what Walker had said, and knocked repeatedly on the bathroom door. Coakley testified consistently with Melanie and Lockett about the remaining events before Taylor was taken to the hospital.

¶ 11    Coakley testified on cross-examination that, on June 27, 2012, Taylor and Walker were alone in the apartment for a time. On redirect, he said that he did not recall when this was, then testified that he did not think that the two women had been in the apartment all alone that day. On re-cross-examination, he did not recall what he had told a detective about this matter.

¶ 12    Patterson testified on direct examination as follows. At dinner on June 26, 2012, Taylor looked like "a new person." The next day at the barbecue, Patterson saw Walker arrive and spend time with Taylor, walking around the pool. When Patterson returned to the apartment, Taylor and Walker were in the living room. A short time later, from Coakley's bedroom, Patterson looked out and saw a car pull up. Taylor and Walker were outside, and Taylor went to the driver's window. About 10 minutes later, when Patterson was in the bathroom, Taylor came back and asked him to leave the bathroom. Patterson returned to Coakley's bedroom. After a while, he heard the telephone ring three times; Coakley answered it the third time and then tried to open the bathroom door. Coakley called the police, who forced the door open. Paramedics then treated Taylor and removed her.

¶ 13    Patterson testified on cross-examination as follows. Taylor had been a drug addict. On June 26, 2012, she spent some time with Walker, but Patterson did not know how much. Also, late that evening or early the next morning, he saw Taylor vomiting in the bathroom. On June 27, when Walker arrived, Taylor walked with her around the pool. Next, the two women went alone to the apartment, the rest of the family returning later. When the car pulled up, Taylor and Walker approached it together and Walker entered. Taylor then walked around to the front and

started talking to the driver. Patterson saw that a white woman was driving. At that point, Patterson left for the bathroom. On redirect examination, Patterson testified that, when Taylor and Walker left the pool area, he stayed near the pool and could not have known whether someone was already in the apartment.

¶ 14    Mary Margaret Greer-Ritzheimer of the Du Page County Forensic Science Center testified that she analyzed the blood stains from the white-gray sock and a sample from buccal swabs taken from defendant. The DNA profiles matched. The profile would be expected to occur in approximately 1 in 3.1 quintillion Caucasians.

¶ 15    Sara Norris, a drug chemist with the Du Page County Forensic Science Center, testified that she received the small plastic baggie, the two tinfoil bindles, and the off-white powder that came from the bindles. The powder from one bindle, without packaging, weighed 0.02 grams and testing proved that it contained heroin. No additional testing was performed, because the statutory weight class of the substance would not have changed.

¶ 16    Dr. Jeff Harkey, a forensic pathologist, testified on direct examination as follows. On June 28, 2012, he performed the autopsy on Taylor. He found a track-mark scar, the result of repeated use of the same vein, on Taylor's arm. There were no needle-puncture wounds along this track mark, but two freshly-made puncture wounds overlay a different vein. An internal examination showed no evidence of disease.

¶ 17    Harkey recounted his interpretation of a toxicological test from an outside laboratory. Three opiates were found in Taylor's blood and urine: morphine, codeine, and 6-MAM. All are associated with heroin use. In particular, 6-MAM comes only from heroin and is present only after recent heroin use. The presence of 6-MAM means a more recent death than does the

presence of morphine or codeine alone. Cocaine metabolites were also found in Taylor's blood and urine, but Harkey could not say how recently Taylor had ingested cocaine.

¶ 18    Harkey testified that the level of morphine in Taylor's bodily fluids was "way beyond what somebody would take normally medically." Asked whether the level was "at or above levels which have been associated with heroin fatalities," Harkey said yes. He added, however, that there is no "safe amount" of heroin to ingest and that a person can die from taking the same amount that she has been taking regularly for some time. Asked whether he had found "a significant amount of cocaine metabolites" in Taylor's bodily fluids, Harkey responded, "Well, any amount is significant if it's taken when you're not prescribed it. *** But, yes, it was significant in that I included cocaine intoxication ultimately in my cause of death."

¶ 19    Harkey's testimony continued as follows:

"Q. You said the heroin and the morphine was in very high amounts. Could that have been fatal by itself?

A. Heroin use alone without cocaine use?

Q. Yes.

A. Yes.

Q. Did you come to an opinion to a reasonable degree of medical and scientific certainty as to the cause of death?

A. Yes.

Q. And what was your opinion?

A. That Augustina Taylor died of heroin and cocaine intoxication due to intravenous drug use."

¶ 20     Harkey testified on cross-examination as follows.  With enough time, heroin in bodily fluids turns into morphine.  Thus, the level of morphine could result from accumulation over several days.  Also, any level of cocaine can cause fatal cardiac arrhythmia.  How long 6-MAM will be present can vary depending on the individual's metabolism and how much heroin was taken over how long a period.

¶ 21     Harkey's testimony continued:

"Q. Okay.  Well, your testimony on direct was that it's possible that heroin alone could cause a death, correct?

A. Yes.

Q. And your testimony is also that it's possible that cocaine could cause a death; isn't that right?

A. Yes."

¶ 22     On redirect examination, Harkey testified that the presence of 6-MAM indicates recent use; it is not cumulative over a period of persistent use.  The concentration of morphine in Taylor's blood was at or above levels that have been associated with fatalities from heroin alone.

¶ 23     Dan Salzmann testified on direct examination as follows.  In June 2012, he was a Wheaton police detective.  On June 29, 2012, he and another detective, Jason Scott, questioned defendant.  A DVD of the interview was played for the jury, and the trial court admitted a transcript also.  Defendant also wrote out a statement, which was admitted into evidence.

¶ 24     We summarize the interview.  Defendant said that she had been struggling with heroin addiction for 10 years.  She had used crack cocaine on and off for 12 years and had smoked some earlier that day.  However, she said that she was not high or intoxicated and was thinking

straight. Defendant and Walker had met as prostitutes and sometimes did drugs together. Walker and Taylor had been together since late 2011.

¶ 25 Defendant told the detectives that, on June 26, 2012, a man known as "Houdini" gave her a "woop" bag that was "all dorm," *i.e.*, it had little or no actual heroin. She complained, so the next day he came by her house in Summit and gave her a small bag for free. Defendant used two bags of heroin at home. Later that day, Taylor called and asked defendant, " 'Can you get me a rock and blow?,' " *i.e.*, cocaine and heroin. Defendant said that she was unsure because she would have to spend money that belonged to Walker. Taylor told her not to worry; she was with Walker, who was agreeable to the idea, and she (Taylor) had $20. Defendant explained to the detectives that the plan was to sell a rock of crack for $10 and two bindles of heroin for $10.

¶ 26 Defendant said that, later in the day, she was at a hotel with her friend Lewis when Taylor called (apparently the original call described earlier). At this point, defendant did not have all the drugs that Taylor wanted, so she had Lewis drive her back to Summit. Defendant said that, partly as a result of prior purchases, she now had four rocks of cocaine and four bindles of heroin. She went upstairs and consumed two of each. Taylor called and asked defendant to bring her a crack pipe and a needle (syringe). Defendant explained that she acceded to this request only because on June 26, 2012, after Walker had picked up Taylor, Taylor injected herself with heroin in defendant's and Walker's presence. (Walker had also picked defendant up from the hospital that day after defendant completed her drug rehabilitation.)

¶ 27 Defendant told the detectives that, before she left her house in Summit, Taylor kept calling her. She got into the car with the crack cocaine, the two bindles of heroin, a glass crack pipe, and an orange-capped 100-cc syringe. The pipe and the syringe were wrapped in a dirty sock that had some of her blood on it. On the way, she sampled a small amount of the heroin in

one bindle, then closed it up. When Lewis and defendant arrived at Lockett's apartment complex in Wheaton, Taylor exited the building first and Walker followed right after. Defendant gave Taylor the cocaine, the two bindles of heroin, and the sock containing the crack pipe and the syringe. Taylor did not give defendant any money. Walker got into the car and Lewis drove her and defendant away.

¶ 28    Defendant told the detectives that, on the ride back, Walker tried to call Taylor. Walker also excoriated defendant for giving Taylor the drugs. Eventually, Walker spoke to Coakley. She told him to knock on the door, because she wanted to talk to Taylor; when there was no response, she said to break the door down and get Lockett. Walker was becoming frantic. The phone conversation ended. Walker's next calls went unanswered. Defendant called the police and the hospital but got no information on Taylor. Defendant repeatedly told the detectives that she did not poison Taylor and was upset that some members of Taylor's family suspected that she had adulterated the heroin.

¶ 29    Salzmann read defendant's written statement. We quote it in part:

> "On Wednesday night at 6-27-12 Augustina Taylor called me on the phone and asked me if I would get her a rock and a blow and bring it to her when I came to pick Leslie up from Tina's. I bought the crack on Wensday [*sic*][.] I got 4 bags of crack and got four bags of heroin. I did two of the bags of heroin. I kept two bags of heroin and gave it to Tina[.] [T]he one bag was small so it really amounted up to about 1 nice bag. She called me earlier and asked me to bring a bag of dope and a bag of crack and at that time asked for me to bring a needle with [*sic*] and a crack pipe. I went to Wheaton to [T]ina's house to pick [L]eslie up. [A]t that time [T]ina came out and came in [the] car

and I gave it wrapp [*sic*] up in a [d]irty sock.  I also gave her a plastic baggie with two bns [*sic*] of H, and gave her another bag with the crack in it and 1 hit of crack."

¶ 30    Salzmann testified on cross-examination as follows.  When he interviewed Melanie in October 2012, she said that, on June 27, 2012, Taylor and Walker broke away from the rest of the family for "[m]uch of the evening."  A few days later, Coakley told Salzmann that Taylor and Walker spent time alone before rejoining the family.

¶ 31    Salzmann testified that, although he did not recall defendant saying that Taylor had had some heroin left over from the previous day, she did say that Taylor had taken "some left over."  Asked whether Taylor presumably would still have had some of that heroin on the day of the delivery, Salzmann answered, "I would presume that."  While interviewing defendant, Salzmann took no notes, but Scott made some that he showed to Salzmann, suggesting topics to raise.  Later on, when Salzmann was transferred to patrol, the notes were mistakenly thrown out.

¶ 32    The State rested.  At a conference, the parties and the court agreed that the pattern definitional and elements instructions on drug-induced homicide should be used (Illinois Pattern Jury Instructions, Criminal, Nos. 7.27, 7.28 (4th ed. 2000)), modified to accommodate an amendment to the statute, effective in 2006, that replaced "dies as a result of" with "death is caused by."  720 ILCS 5/9-3.3(a) (West 2004); *People v. Kidd*, 2013 IL App (2d) 120088, ¶ 30.  Thus, the definitional instruction read, "A person commits the offense of Drug Induced Homicide when he knowingly delivers to another a substance containing heroin, a controlled substance, and any person's death is caused by the injection, inhalation or ingestion of any amount of that controlled substance."  The elements instruction was phrased consistently with the definitional instruction.  The parties and the court also agreed to use the pattern instruction on delivery of a controlled substance.  See Illinois Pattern Jury Instructions, Criminal, No. 17.18

(4th ed. 2000). The court then told defendant that it would not give a proposed instruction (No. 3), stating that, if law-enforcement officers "destroyed or failed to preserve any investigative material" that had come into their possession, the jury could infer that the material, had it been preserved, "would have led to the presentation of evidence unfavorable to the State's case." The court explained that, although there was testimony that notes of the interview with defendant had been lost inadvertently, the notes merely recorded what defendant had said, all of which had been preserved on the DVD.

¶ 33    Defendant's sole witness was Walker, who testified on direct examination as follows. She had been Taylor's girlfriend and had met defendant because they both sold drugs. She had used heroin with Taylor and defendant, sometimes with both together. On the afternoon of June 26, 2012, Walker picked up Taylor at the bus station and, because Taylor wanted to get high, Walker took her to Summit, where Walker and defendant resided. When they arrived, about 4 or 5 p.m., Taylor went next door and bought heroin. She returned to Walker's house, where she injected some heroin and Walker "tooted" (snorted) some. In the evening, Walker, now accompanied by defendant, drove Taylor home to Wheaton. Walker and defendant returned to Summit and used heroin and crack through the next morning, without sleeping.

¶ 34    Walker testified that, on June 27, about 2 or 3 p.m., defendant drove her to Wheaton, dropped her off, and left. Walker spent some time by the pool, speaking with Taylor's family, then went inside. A few minutes after Walker arrived, Taylor snorted heroin in the bathroom. Late that evening, Walker passed out. Taylor woke her up and said that defendant was outside. Taylor went out. Walker followed her. By the time Walker got to the car, Taylor was hugging defendant and talking about getting together the next day. Lewis was driving the car, and defendant was in the front passenger seat. Walker got into the car, behind Lewis. He drove off.

¶ 35    Walker testified that she did not see defendant give Taylor any drugs.  Taylor "probably did" have drugs on her when Walker rode off, because earlier that day Taylor had been angry at Walker for not bringing a needle so that she could inject the heroin instead of snorting it.  On the ride back, Walker called Lockett's apartment and learned that Taylor had overdosed.  Asked whether she had later told the police that defendant had given Taylor drugs, Walker testified that she did not so recall but that she did not remember, as it had been two years ago.  The next day, Walker beat defendant, because defendant had brought Taylor a syringe after Walker had told her not to do it.  Later, defendant went to the police station but Walker did not.  Walker admitted that she was a drug addict with a criminal record.

¶ 36    Walker testified on cross-examination as follows.  She recalled speaking to Salzmann in December 2012.  She lied to him about what she had done on June 26, 2012, saying that she and Taylor had visited Walker's sister in LaGrange.  She also lied by telling Salzmann that Taylor wanted heroin but Walker refused to give her any.  Also, Walker conceded that she did not tell Salzmann that, on June 27, 2012, Taylor used heroin in the bathroom only minutes after Walker arrived in Wheaton; she testified that she had promised Taylor that she would not let her family know that Taylor had returned to using drugs.  Asked whether she had told defendant in the parking lot that Taylor did not have to pay for the drugs that defendant gave her, Walker testified that she did not recall any such thing.

¶ 37    Walker conceded that, on the ride back, she called Lockett's home numerous times and eventually told someone to get Taylor out of the bathroom.  However, she did not tell the person that Taylor had taken drugs; rather, she warned that Taylor had a syringe.  Walker was angry at defendant for giving Taylor the syringe, but Taylor had already had heroin with her.  Taylor had used heroin on June 26 but had not had a syringe so had not injected it.  The defense rested.

¶ 38    In rebuttal, Salzmann testified that on December 5, 2012, he and Scott interviewed Walker in Chicago. Walker told them that, in the car, defendant admitted to her that she delivered heroin and a syringe to Taylor. Walker also said that she called Lockett's apartment, spoke to Coakley several times, and could hear people pounding on the bathroom door. She also admitted that she told Coakley that someone might have given Taylor heroin.

¶ 39    At the instructions conference, the parties and the court discussed the pattern instruction on causation in homicide cases (Illinois Pattern Jury Instructions, Criminal, No. 7.15 (4th ed. Supp. 2011) (hereinafter, IPI Criminal 4th No. 7.15 (Supp. 2011))), which, as eventually used here, read:

> "In order for you to find that the acts of the defendant caused the death of Augustina Taylor, the State must prove beyond a reasonable doubt that defendant's acts were a contributing cause of the death and that the death did not result from a cause unconnected with the defendant. However, it is not necessary that you find the acts of the defendant were the sole and immediate cause of death."

¶ 40    The judge stated that, under *Kidd*, IPI Criminal 4th No. 7.15 (Supp. 2011) was proper. Defendant disagreed. She contended in part that the instruction was potentially misleading in that it referred to her " 'acts,' " which the jury might take to include both the delivery of the heroin and the delivery of the cocaine, even though only the former was a proper basis for a conviction. Defendant requested that the instruction be modified to refer to " 'defendant's act of delivering heroin' " rather than " 'defendant's acts.' " The State responded that the preceding instructions clarified that defendant's "acts" were limited to delivering the heroin (and did not include delivering the cocaine).

¶ 41    The discussion returned to causation.   Defendant insisted that the requirement of proximate causation be embodied in the pertinent instruction.   She tendered an instruction (Defendant's instruction No. 4) that replaced "a contributing cause" with "the proximate cause." Defendant argued in part that the "contributing cause" phraseology was disapproved in *Burrage v. United States*, 571 U.S. ___, 134 S. Ct. 881 (2014), in which, she argued, the Court had interpreted a statute essentially similar to the Illinois drug-induced-homicide statute as requiring proof beyond a reasonable doubt that the use of the drug had been a "but-for" cause of death. Defendant tendered another instruction, based on *Burrage* (Defendant's instruction No. 5), reading, "Proximate cause is a cause that directly produces an event and without which the event would not have occurred.  Proximate cause is established if Augustina Taylor's death was caused by the heroin that defendant delivered to her."

¶ 42    The judge again noted that *Kidd* had approved the concept of a "contributing cause" and the use of IPI Criminal 4th No. 7.15 (Supp. 2011).   Defendant responded that *Kidd* was distinguishable in that the delivery of the drugs there allegedly set off a chain of events that resulted in the victim's death, whereas here there were two simultaneous deliveries and it was possible that the jury could find that either one alone was the sole cause of the victim's death. The judge concluded that *Kidd* controlled, and he decided to give IPI Criminal 4th No. 7.15 (Supp. 2011) and not defendant's proposed alternatives.

¶ 43    Defendant also requested that the jury be given one of four alternative instructions on credibility (Defendant's instruction Nos. 1A, 1B, 1C, 1D).  The first read:

> "You have before you evidence that a witness was, or is, a user of narcotics.  It is for you to determine whether the witness is, or was, addicted to narcotic drugs.

If you find from your consideration of the evidence that the witness was, or is, addicted to narcotics you must subject his testimony to close scrutiny and act upon it with great caution, for the law recognizes that narcotics addicts become habitual liars."

The remaining three alternatives read, "The testimony of a narcotics addict is subject to suspicion due to the fact that habitual users of narcotics become notorious liars"; "Testimony from a witness who was addicted to narcotics at the time of the events about which he has testified should be regarded by you with suspicion"; and, "Evidence that a witness was addicted to narcotics at the time he observed things reported in his testimony may be used by you in determining the weight to be given to that testimony." All the instructions were based on *People v. Strother*, 53 Ill. 2d 95 (1972). The judge refused the instructions, explaining that the existing instructions already covered witness credibility and that defendant could argue to the jury that drug addiction was relevant to credibility.

¶ 44    Defendant also tendered several instructions directly related to the charged offense. Defendant's instruction No. 2 was based on a pattern instruction (Illinois Pattern Jury Instructions, Criminal, No. 4.16 (4th ed. 2000)) and defined actual possession, constructive possession, and joint possession. On the last point, it read, "If two or more persons share the immediate and exclusive control or share the intention or the power to exercise control over a thing, then each person has possession." Defendant's instruction No. 6 was based on a pattern instruction (Illinois Pattern Jury Instructions, Criminal, No. 17.13A (4th ed. 2000)) and read, "An agreement may be implied from the conduct of the parties although they acted separately or by different means and did not come together or enter into an express agreement." Finally, Defendant's instruction No. 7 was based on a pattern instruction (Illinois Pattern Jury

Instructions, Criminal, No. 17.05A (4th ed. 2000)) and defined " 'deliver' " as "to transfer possession or to attempt to transfer possession." The judge refused all the tendered instructions.

¶ 45    In closing argument, the State noted the evidence that the officers found when they opened the bathroom door and found Taylor unconscious inside. The State also noted defendant's admission to Salzmann and Scott that she had delivered heroin to Taylor. The presence of 6-MAM in Taylor's bodily fluids at the autopsy showed that she had consumed heroin recently. Moreover, according to the people who saw Taylor on the evening of June 26, 2012, and again on June 27, 2012, she appeared fine until defendant showed up in the evening. An hour later, she was dead.

¶ 46    The State turned to the causation issue. Referring to the trial court's instruction on the issue, the State contended that it had proved beyond a reasonable doubt that the heroin defendant delivered had been a contributing cause of Taylor's death:

> "Well, all that discussion about whatever other drugs, *what did Dr. Harkey tell you? The opiates alone were a fatal dosage.* The opiates alone and the 6-MAM being present told him recent use. Forget the science of it all. Just think about it. Think about the timing of it all. She is alive for all those hours, and then an hour after she shows up, she is dead and we find all those items that were inside the bathroom." (Emphasis added.)

¶ 47    Defendant's argument also stressed causation, commenting on Harkey's testimony:

> "Dr. Harkey testified to you *** that the cocaine could have caused the death on its own. What does that tell you? The cocaine. He said it from that stand. Their witness. *The cocaine could have caused the death on its own.* It is possible. Reasonable doubt, ladies and gentlemen." (Emphasis added.)

Defendant reminded the jury, "That cocaine you cannot consider as part of the cause of death, if you believe [defendant] did it." Further, although Harkey had testified that the presence of 6-MAM in Taylor's bodily fluids on June 28, 2012, proved recent heroin use, he had not defined "recent" with any precision, and all the crucial events had taken place within 24 hours.

¶ 48    In rebuttal, the State again noted how soon Taylor's death followed on defendant's visit. Returning to the causation issue, the State argued:

> "[C]ounsel was talking about the cocaine could have killed her alone, but you have to remember Dr. Harkey's testimony, and he was really clear on this, folks. *He said the heroin alone was at a fatal level. The heroin alone was at a fatal level.*
>
> Could the cocaine also have killed her? Sure. You can't ignore that. But the amount of heroin alone could cause her death. Remember what Dr. Harkey said? There is no safe amount of heroin to use. Someone could use the same amount of heroin again and again, and the next time they use it, it could cause their death." (Emphasis added.)

¶ 49    The State argued that Harkey had testified that the presence of 6-MAM showed that the heroin had been consumed "within hours." Also, Taylor's arm had fresh puncture marks that showed a recent injection of heroin. Further, the evidence of Taylor's activity and her demeanor before defendant arrived on the evening of June 27, 2012, negated defendant's theory that Taylor and Walker had gone off alone and used heroin earlier that day.

¶ 50    The State returned to the theme of contributing cause, reiterating that Harkey had testified that the "[h]eroin *** alone could have caused [Taylor's] death." The State contended, "though we don't have to show [heroin] is the sole and immediate cause, and we have ample evidence of cocaine also being a contributing factor, as long as the heroin by itself could cause death, we

have met our burden on this part of the case as well." At this point, defendant objected that the argument misstated the law.

¶ 51 At a sidebar, the State agreed to rephrase the argument. The State then contended, "The heroin that Dr. Harkey told you, the amount of heroin found in her was fatal by itself, fatal by itself. Now, did cocaine also contribute to the cause of death? Absolutely. But don't lose track of the fact—" After the court overruled a defense objection, the State reiterated that the heroin need not have been the sole and immediate cause of Taylor's death; it sufficed that "[Harkey] testified that the amount of heroin in her by itself *could* have caused her death." (Emphasis added.) The State then wrapped up its argument, stressing defendant's admissions to the detectives.

¶ 52 The jury convicted defendant of both offenses. She moved for a new trial, arguing in part that the trial court erred in refusing to give her various tendered instructions, including the one on proximate cause in place of IPI Criminal 4th No. 7.15 (Supp. 2011). The court denied the motion and sentenced defendant to nine years' imprisonment for drug-induced homicide. She timely appealed.

¶ 53 On appeal, defendant raises several claims of error. First, she contends that the trial court erred in giving the jury the instruction based on IPI Criminal 4th No. 7.15 (Supp. 2011) and refusing to give her proposed instructions based on *Burrage*. Second, she contends that the court erred in refusing to give her other tendered instructions (Defendant's instruction Nos. 1, 2, 3, 6, and 7). Third, she contends that the evidence did not prove her guilty beyond a reasonable doubt of drug-induced homicide.

¶ 54 We turn to defendant's first claim of error. The backdrop is as follows. The drug-induced-homicide statute requires the State to prove that the victim's death was "caused by" the

ingestion of any amount of the controlled substance that the defendant delivered. 720 ILCS 5/9-3.3(a) (West 2012). Here, the State charged defendant with delivering heroin that, when Taylor ingested it, caused her death. The State did not base the charge on defendant's alleged delivery of cocaine to Taylor, although she ingested it within the same narrow time frame in which she ingested the heroin. At trial, therefore, defendant argued that the State did not prove beyond a reasonable doubt that the heroin, specifically, "caused" Taylor's death. Thus, the success of the State's case potentially depended on the definition of "cause" that the jury received.

¶ 55 Defendant contends that the jury received the wrong definition. She argues that, in accordance with *Burrage*, the court should have instructed the jury not that the State needed to prove that the heroin "contributed" to causing Taylor's death but that the heroin was a "but-for" cause of Taylor's death. Defendant asserts that *Burrage* based its holding on both statutory construction and constitutional due process. She acknowledges that this court is not bound by the Court's construction of a federal act, but she contends that *Burrage*'s discussion of the constitutional basis for requiring but-for causation in a criminal statute is, at least, a judicial *dictum* that a state court must follow. See *Lebron v. Gottlieb Memorial Hospital*, 237 Ill. 2d 217, 236 (2010); *Cates v. Cates*, 156 Ill. 2d 76, 80 (1993).

¶ 56 The instruction that was based on IPI Criminal 4th No. 7.15 (Supp. 2011) told the jury that it could convict defendant if it found beyond a reasonable doubt that the heroin was a "contributing cause" of Taylor's death. We note that IPI Criminal 4th No. 7.15 (Supp. 2011) does not define this term, other than to explain that it need not be the sole and immediate cause of death. Defendant's instruction No. 4 would have replaced the quoted terminology with the words "the proximate cause," which her instruction No. 5 would have defined as a "but-for" cause of Taylor's death. Defendant asserted that the departure from the pattern instruction was

necessitated, or at least strongly supported, by *Burrage*. To address defendant's argument, we first examine *Burrage* in detail.

¶ 57    In *Burrage*, the Court considered a provision of the Controlled Substances Act (Act) that imposes a mandatory minimum sentence of 20 years on a defendant who unlawfully distributes a Schedule I or II drug, when " 'death or serious bodily injury results from the use of such substance.' " *Burrage*, 571 U.S. at ___, 134 S. Ct. at 885 (quoting 21 U.S.C. § 841(a)(1), (b)(1)(A)-(C) (2012)). The issue was whether the provision applies when the use of the drug "contributes to," but is not a but-for cause of, the victim's death or injury. *Id*. at ___, 134 S. Ct. at 885. The Court held that, with an important qualification, the mandatory-minimum provision does not apply unless the use of the drug is a but-for cause of death.

¶ 58    In *Burrage*, the defendant sold the victim, Banka, heroin. Banka died following an "extended drug binge" that included the heroin and several other controlled substances that he had used shortly before buying and using the heroin. *Id.* at ___, 134 S. Ct. at 885. The United States charged the defendant with distributing heroin and contended that the mandatory 20-year minimum applied. *Id.* at ___, 134 S. Ct. at 885. The causation requirement was an element of the offense and thus had to be proved beyond a reasonable doubt. *Id.* at ___, 134 S. Ct. at 887.

¶ 59    At the defendant's trial, the two medical experts who testified on the cause of Banka's death both stated that, at the time of death, multiple drugs were present in his system. According to the experts, morphine, a heroin metabolite, was the only drug present at a level above the therapeutic range, but neither expert could say definitively that Banka would have lived had he not taken the heroin. One expert concluded that the heroin was a " 'contributing factor' " of death, because it interacted with the other drugs to produce an overall effect that caused Banka to stop breathing. *Id.* at ___, 134 S. Ct. at 885-86. The other expert described the cause of death as

" 'mixed drug intoxication,' " in which the heroin and several other drugs played "a 'contributing' role." *Id.* at ___, 134 S. Ct. at 886. She could not say whether Banka would have lived had he not taken the heroin, but she testified that his death would have been " '[v]ery less likely.' " *Id.* at ___, 134 S. Ct. at 886.

¶ 60 The trial court denied the defendant's motion for a judgment of acquittal, rejecting his contention that, to prove that Banka's death resulted from the heroin, the government had to show that the heroin was a but-for cause of death. *Id.* at ___, 134 S. Ct. at 886. The court then instructed the jury that, to prove that Banka's death resulted from the heroin, the government needed to show only that the heroin was " 'a contributing cause,' " and it refused the defendant's proposed instruction that the government had to prove that the heroin was the proximate cause of death. *Id.* at ___, 134 S. Ct. at 886. The jury convicted the defendant.

¶ 61 The federal appellate court affirmed the judgment. *Id.* at ___, 134 S. Ct. at 886. The defendant appealed, arguing that the "contributing cause" instruction was erroneous. The Supreme Court agreed.

¶ 62 The Act does not define " 'results from,' " so the Court gave it its ordinary meaning, which "imposes *** a requirement of actual causality." *Id.* at ___, 134 S. Ct. at 887. Absent any indication to the contrary, "courts regularly read phrases like 'results from' to require but-for causality." *Id.* at ___, 134 S. Ct. at 888. The Court recognized an exception: when multiple sufficient causes independently, but concurrently, produce a result. Thus, if one person shoots a victim, a second person simultaneously stabs him, and both wounds are fatal, the shooter will be liable for murder, even though his conduct was not a but-for cause of the victim's death. *Id.* at ___, 134 S. Ct. at 890. However:

"We need not accept or reject the special rule developed for these cases, since there was no evidence here that Banka's heroin use was an independently sufficient cause of his death. No expert was prepared to say that Banka *would have* died from the heroin use alone." (Emphasis added.) *Id.* at ___, 134 S. Ct. at 890.

¶ 63 The Court conceded that several state courts used a less demanding rule than the requirement of but-for causation. In these jurisdictions, "an act or omission is considered a cause-in-fact if it was a 'substantial' or 'contributing' factor in producing a given result." *Id.* at ___, 134 S. Ct. at 890. However, the Court noted that, in the tort context, courts in these jurisdictions did not consider a defendant's act a cause of a given result unless (1) the act was one of two or more causes that were independently effective; or (2) the event would not have occurred but for the act. *Id.* at ___, 134 S. Ct. at 890; see Prosser and Keeton on the Law of Torts § 41, at 267-68 (W. Page Keeton *et al.* eds., 5th ed. 1984) (Keeton). Thus, applying the tort form of the "contributing cause" rule would change nothing in *Burrage*: a "contributing cause" is really a "but-for cause."

¶ 64 The Court noted, however, that in criminal cases the contributing-cause test had proved inherently vague and had led to widely differing results. *Id.* at ___, 134 S. Ct. at 891. For example, one court had held that a defendant's act could satisfy the test even if other concurrent acts would have produced the same result on their own, while another court had held that the existence of independently sufficient other acts negated causation as to the defendant's act. *Id.* at ___, 134 S. Ct. at 891; see *Wilson v. State*, 24 S.W. 409, 410 (Tex. Crim. App. 1893); *Cox v. State*, 808 S.W.2d 306, 309 (Ark. 1991).

¶ 65 Further, the Court reasoned, a literal reading of the contributing-cause formula could "treat as a cause-in-fact every act or omission that makes a positive incremental contribution,

however small, to a particular result." *Burrage*, 571 U.S. at ___, 134 S. Ct. at 891. To limit this extremely liberal standard by excluding causes that were too insubstantial would produce endless confusion that could not be reconciled with the imperatives to require proof beyond a reasonable doubt of guilt and "to express criminal laws in terms ordinary persons can comprehend." *Id.* at ___, 134 S. Ct. at 892. In any event, the plain language of the Act barred such an option. *Id.* at ___, 134 S. Ct. at 892. Thus, the Court held, "at least where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable under [the Act's enhancement provision] unless such use is a but-for cause of the death or injury." *Id.* at ___, 134 S. Ct. at 892.

¶ 66    Defendant urges us to adopt the rule in *Burrage*. Although the Court's holding addressed the proper construction of a federal statute, which does not bind this court, she contends that there are strong reasons to follow it. First, she asserts, the Act uses causation language that is indistinguishable from the causation language in the drug-induced-homicide statute. Second, she maintains, the Court stated, in what is at least judicial *dictum*, that the "contributing cause" interpretation potentially violates a requirement of due process: that a conviction be based on nothing less than proof beyond a reasonable doubt.

¶ 67    The State responds that the trial court's instruction was proper because it followed *Kidd*'s construction of the drug-induced-homicide statute and a long line of opinions construing the term "cause" in homicide statutes to mean "contributing cause" and not "but-for cause." The State also asserts that the *Burrage* Court construed only the federal Act and declined to hold that a state statute must be interpreted by a state court in harmony with the result in *Burrage*.

¶ 68    We must clarify Illinois law on causation in homicide cases, both under the drug-induced-homicide statute and, as pertinent, elsewhere. In *Kidd*, the only Illinois opinion

construing the causation requirement specifically in the former context, the State alleged that the defendant knowingly delivered cocaine to his girlfriend and that she later ingested it, which caused her death. *Kidd*, 2013 IL App (2d) 120088, ¶ 1. The toxicology report disclosed that cocaine, morphine, and Xanax were present in the victim's system. *Id.* ¶¶ 12, 15. The level of morphine was far in excess of the level that the forensic pathologist who performed the autopsy considered " 'a potential cause of death.' " *Id.* ¶ 12. The defendant's expert also described the level of morphine in the victim's system as " 'lethal.' " *Id.* ¶ 4. The Xanax was present at a therapeutic level. *Id.* ¶ 15. However, Xanax " 'enhance[d] the toxicity of the morphine.' " *Id.*

¶ 69    The forensic pathologist testified that there was no way to determine the order in which the victim had consumed the cocaine and the morphine. *Id.* ¶ 12. The defendant's expert testified, based on the degree to which the cocaine had been metabolized, that the victim had consumed the cocaine well before she consumed the morphine. *Id.* ¶ 14. The forensic pathologist testified that the cause of the victim's death was hypoxia caused by " 'cocaine and opiate intoxication.' " *Id.* ¶ 12. Apparently, the forensic pathologist did not express a definitive opinion on whether either cocaine or morphine without the other would have caused the victim's death. The defendant's expert did not express an opinion on the cause of death, although it appears that his testimony in itself would not have supported a finding beyond a reasonable doubt that the cocaine alone would have caused the victim's death.

¶ 70    The trial court instructed the jury in accordance with IPI Criminal 4th No. 7.15 (Supp. 2011) and its "contributing cause" language. The court refused the defendant's tendered instructions, which would have required that, for a conviction, the jury find that the cocaine was a proximate cause of the victim's death, *i.e.*, a cause that directly produced the death and without which the death would not have occurred, but not necessarily the only, last, or nearest cause.

The tendered instructions also stated that, to establish proximate cause, the State had to prove that death was a reasonably foreseeable result of the defendant's conduct. *Id.* ¶¶ 20-22. The jury convicted the defendant. *Id.* ¶ 26.

¶ 71 On appeal, the defendant argued that the trial court had erred in refusing his tendered instructions on proximate causation. In addressing the issue, this court first noted that, before January 1, 2006, the drug-induced-homicide statute had used the phraseology "any person dies as a result of" (720 ILCS 5/9-3.3(a) (West 2004)), for which the legislature had substituted, "any person's death is caused by" (720 ILCS 5/9-3.3(a) (West 2006)). *Kidd*, 2013 IL App (2d) 120088, ¶ 30. We concluded that the amendment's intent was to make the statute "mirror[] the language of other homicide statutes." *Id.* ¶ 31. There was no intent "to make a significant change in the underlying meaning of the concept of causation." *Id.* We note here that the original language tracks that of the federal Act that *Burrage* construed.

¶ 72 We then turned to the defendant's claim of error. We rejected the defendant's assumption that the statute did not make him liable for the victim's death unless he could have reasonably anticipated that the sequence of events would result in the victim's death, specifically that, in addition to ingesting cocaine, she would later ingest morphine. *Id.* ¶¶ 32, 34. We observed that the statute required the State to prove only that the defendant knowingly delivered the cocaine and that the victim had died as a result. *Id.* ¶ 33. The defendant's tendered instructions "confuse[d] the concept of causation with a foreseeable result." *Id.* ¶ 34. And, although proximate cause was a requirement for a conviction, the instruction based on IPI Criminal 4th No. 7.15 (Supp. 2011) already explained this concept. *Id.*

¶ 73 *Kidd* controls here only insofar as defendant's tendered instructions incorporated the concept of proximate cause (or "legal cause," as opposed to cause-in-fact). To that extent, we

reject her claim of error. There was no more need to incorporate proximate cause into a separate instruction than there was in *Kidd*. That said, the principal and more difficult aspect of defendant's claim remains. Defendant's tendered instructions also stated that, to convict her, the jury must find that the heroin was a but-for cause (cause-in-fact) of Taylor's death. Thus, defendant argues, the rejection of her tendered instructions was error because it created the danger that the jury would convict her without finding that the heroin was either a but-for cause of Taylor's death or an independently sufficient cause of it.

¶ 74 There is a potential procedural/forfeiture barrier to defendant's argument on appeal. Her tendered instructions deviated from *Burrage*. They stated that, to find that Taylor's death was caused by the heroin, the jury must find that the heroin was a but-for cause of the death. They did *not* give the jury the alternative ground for finding causation: that, even had the cocaine been sufficient to cause Taylor's death, defendant could still be convicted if the State proved beyond a reasonable doubt that the heroin on its own also would have caused Taylor's death. Thus, the tendered instructions actually misstated the law to defendant's advantage because they eliminated one ground of causation that *Burrage*, at the very least, left open. Moreover, this ground is one that the law widely recognizes, as *Burrage* noted.

¶ 75 Nonetheless, this problem does not support the trial court's refusal of defendant's proposed instructions. This is because the evidence would not have allowed a conviction based on a "multiple-sufficient-causes" theory, since it was legally insufficient to prove that the heroin alone was an independently sufficient cause of death. Thus, the tendered instructions' failure to give the jury this option was not a disqualifying defect under the circumstances.

¶ 76 We recognize that our conclusion requires us to view the evidence in the light most favorable to the State. See *People v. Collins*, 106 Ill. 2d 237, 261 (1985). Nonetheless, the only

way that the jury could have found that the heroin was an independently sufficient cause of Taylor's death was to engage in the sort of inherently probabilistic—and vague—calculus that *Burrage* repudiated—rightly, as we shall explain. The expert evidence here suffered from defects similar to those in the expert testimony in *Burrage*. Harkey's testimony, even construed most favorably to the State, allowed at most an inference that the heroin by itself *might have* caused Taylor's death or that it increased the *probability* of death.

¶ 77 On direct examination, Harkey granted that the morphine in Taylor's system was "at or above levels which have been associated with heroin fatalities." He also granted that heroin use without cocaine use "*[c]ould \*\*\* have been* fatal by itself." (Emphasis added.) On cross-examination, Harkey answered "Yes" to the proposition that "*it's possible* that heroin alone could cause a death." (Emphasis added.) None of these answers, even construed liberally, amounted to an opinion that the heroin alone *would* have caused Taylor's death. The first statement was a general proposition about the "*association*" between a given level of heroin in the system and the incidence of death *in the population as a whole*. At most, it eliminated the possibility that the heroin could not possibly have caused Taylor's death. The second and third statements were ones of possibility only: the heroin alone "could" have caused Taylor's death. "Could" is simply not "would," and thus the characterizations here are as infirm as those in *Burrage*, on similar grounds. See *Burrage*, 571 U.S. at ___, 134 S. Ct. at 890 (although experts testified that victim's heroin use contributed to process that resulted in victim's death, and that it made death more likely, "[n]o expert was prepared to say that [victim] would have died from the heroin use alone"). And we agree with defendant that we should follow *Burrage*, for two compelling reasons.

¶ 78    First, the Court's construction of the federal Act, while not binding on our construction of the state statute, is based on generally accepted principles of statutory construction, including the rule of lenity.    As *Burrage* noted, "[t]his but-for requirement is part of the common understanding of cause" and, without specific indications to the contrary, "courts regularly read phrases like 'results from' to require but-for causality."  *Id.* at ___, 134 S. Ct. at 888; see *id.* at ___, 134 S. Ct. at 891 (criminal statutes are subject to rule of lenity).  To allow a person to be convicted of "homicide" because she *might* have caused the victim's death violates the traditional understanding of causality and the rule of lenity, if not the obvious intent of the legislature in enacting the statute.  Second, the Court's judicial *dictum* on reasonable doubt cannot be taken lightly.  We see no answer to the Court's warning that giving juries standards that enable them to find causation based on an unspecified "contribution" to the likelihood of death raises grave due-process concerns.

¶ 79    Therefore, we cannot say that the deficiency in the instructions that defendant tendered, in itself, supported the trial court's refusal to instruct the jury that, to convict defendant, it must find that the heroin was a but-for cause of Taylor's death.  The use of the term "contributing cause" invited the jury to engage in the same problematic conduct that concerned the Court in *Burrage*: to convict based on a spurious theory of causation, one that relied on "could have" and "more or less probable" rather than proof beyond a reasonable doubt.

¶ 80    It is crucial to stress that this danger was real both in *Burrage* and here *even if, in actuality, the technical legal definition of "contributing cause" is no broader than the scope of the theories of which the Burrage Court did not disapprove.*  Here, as in *Burrage*, the jurors were not given the case law construing and applying the term "contributing cause."  That case law is challenging enough for treatise writers and courts (as we intend to make all too clear shortly).  In

actuality, as we shall explain, it is unclear whether the scope of causation in criminal homicide cases is broader than the sum of the two theories of which *Burrage* did not disapprove.

¶ 81    As noted, the issue of whether the statute requires "but-for" causation instead of "contributing" causation calls forth a concealed but potentially crucial issue: whether, at least in Illinois law, an act can be a "contributing cause" of death without being either a but-for cause or one of two or more independently sufficient concurrent acts.  *Burrage* concluded that courts that adopted the "contributing cause" approach in the *tort* context did not consider a defendant's act a cause of a given result unless (1) the act was one of two or more causes that were independently effective or (2) the event would not have occurred but for the act.  *Id.* at ___, 134 S. Ct. at 890; see Keeton, *supra*, § 41.  (A third and more lenient approach had received no judicial approval. *Burrage*, 571 U.S. at ___, 134 S. Ct. at 890.)   However, the Court observed, "[t]he judicial authorities invoking a 'substantial' or 'contributing' factor test in *criminal* cases differ widely in their application of it."  (Emphasis added.)  *Id.* at ___, 134 S. Ct. at 891.  Our research into both Illinois and foreign case law confirms this observation and validates the Court's concern that instructing juries with the term "contributing cause" produces confusion and potential unfairness.

¶ 82    We turn first to the Illinois case law, beginning our discussion with *Kidd*.  Apparently, on appeal, the defendant presupposed that the medical evidence had allowed the jury to find beyond a reasonable doubt that, even if neither the cocaine alone nor the morphine alone caused the victim's death, the combination of the two did so.  He did not argue that the evidence proved only that the morphine alone, without the cocaine, would have caused the victim's death.  Thus, he apparently conceded that the jury could have properly found that the cocaine was a but-for cause of the death—which would have satisfied the Act as construed in *Burrage*.  Whether the evidence did allow the jury to find so was not at issue on appeal.  Also, whether the cocaine was

one of two or more independently sufficient agents was not at issue, although our opinion strongly suggests that the jury could not have so found. Apparently, neither expert's testimony could have been stretched this far.

¶ 83    Thus, *Kidd* did not directly address the issues here—whether the "contributing cause" standard is correct and whether a "contributing cause" can be something other than either a but-for cause or one of two or more independently sufficient acts. Our opinion was simply not concerned with unpacking the term "contributing cause." Although we did not disapprove the trial court's decision not to give an instruction that defined causation as but-for causation only, that aspect of the instruction was not at issue on appeal and we did not address it.

¶ 84    We did make clear, however, that the test for causation in a drug-induced-homicide case is the traditional judicially-crafted test in homicide cases. The committee comments to IPI Criminal 4th No. 7.15 (Supp. 2011) show that the test pivots on the concept of a "contributing cause." "The Illinois Supreme Court has held that a defendant's act need not be the sole or immediate cause of death; it is sufficient if the defendant's act contributed to cause the death." IPI Criminal 4th No. 7.15 (Supp. 2011), Committee Note, at 230.

¶ 85    Therefore, we consider the case law behind IPI Criminal 4th No. 7.15 (Supp. 2011), keeping in mind our basic inquiry: is the term "contributing cause" any broader than the range of causation approved in *Burrage*—and, if so, is such a broad concept of causation undermined by *Burrage*—either as persuasive authority on statutory construction or as the source of *judicial dicta* on constitutional due process (proof beyond a reasonable doubt)?

¶ 86    We start with the cases that the committee note cites. Whether these opinions support the proposition that a "contributing cause" can be something other than either a but-for cause or one of multiple independently sufficient acts is difficult to say, in part because their reasoning is not

always clear. But the cases strongly suggest that the concept of "contributing cause" is not only broader than that of "but-for cause" but also far less well-defined.

¶ 87     In *People v. Brown*, 169 Ill. 2d 132 (1996), a murder case, the defendant was one of two men who were seen carrying firearms and running from an alley where shots had just been fired. The body of the victim, Sims, had three gunshot wounds. Two different bullets were recovered from his body; the bullet that caused the third wound had left his body. *Id.* at 139. According to the supreme court, the pathologist's expert testimony was that "[the victim] died as a result of the gunshot wounds." *Id.* The pathologist could not say which of the three wounds caused Sims' death, but agreed that " 'any three of them' could have killed him." *Id.* We note the obvious opacity of the quoted testimony.

¶ 88     The defendant argued that the State had not proved beyond a reasonable doubt that his acts caused Sims' death. The court rejected this argument, primarily on the narrow ground that the trial court as fact finder could have concluded that the defendant had fired the weapon that he denied having fired. *Id.* at 152-53. However, the court added that, even granting the defendant's premise, the trial court could still have found that, by firing the other weapon, the defendant contributed to Sims' death. The court relied on the pathologist's mystifying statement that Sims had died as a result of " 'any three of [the wounds].' " *Id.* at 153.

¶ 89     What *Brown* stands for is unclear, but it does not unambiguously imply that the defendant's criminal act was other than either a but-for cause or one of multiple independently sufficient acts. The pathologist might have meant that any *one* of the three wounds "*could*" (not "would") have killed Sims or that *all three* wounds had been needed. In sum, *Brown* uses the contributing-cause language, but what to make of it is difficult to say. While it is possible to

read *Brown* as implying that it was sufficient for causation purposes that the defendant's act(s) merely made Sims' death more likely, it is possible to read it otherwise.

¶ 90    The other principal case that the committee note cites is *People v. Brackett*, 117 Ill. 2d 170 (1987), in which the defendant was convicted of murder. The evidence showed that he had raped and beaten an 85-year-old woman who had previously been in good health. The victim was admitted to the hospital and later to a nursing home; five weeks after the attack, she died of asphyxiation while eating. *Id.* at 173-74. Before the supreme court, the defendant argued that the State had not proved beyond a reasonable doubt that his criminal acts caused the victim's death. The court rejected his attempt to characterize the asphyxiation as an intervening cause that was completely unrelated to his criminal acts. *Id.* at 175-76. The court explained that the defendant's attack caused the injuries that made the victim unable to avoid asphyxiation through normal means and also made it impossible for the nursing home to use a feeding method that would have prevented asphyxiation. Thus, the evidence proved the defendant guilty of murder, because his acts had "set in motion a chain of events which contributed to her death." *Id.* at 179. In *Brackett*, the defendant's criminal conduct was a but-for cause of the victim's death.

¶ 91    The remaining opinions that the committee note cites are unclear guidance at best. In *People v. Woodard*, 367 Ill. App. 3d 304 (2006), causation does not appear to have been discussed at all. In *People v. Martinez*, 348 Ill. App. 3d 521 (2004), the defendant participated in a group beating that resulted in the victim's death. The court affirmed his murder conviction, but the terse opinion makes unclear why it found the evidence sufficient. It is not clear that the court relied on anything more than that (1) the defendant contributed to the beating and (2) the beating caused the victim's death. Assuming that the court so reasoned, it implied that an incremental increase in the probability of death is sufficient to make an act a cause of the death, even without

proof that the act was either a but-for cause or one of multiple independently sufficient acts. This is the nebulous and constitutionally suspect reasoning that *Burrage* rejected—rightly, in our view.

¶ 92     In *People v. Gruner*, 130 Ill. App. 3d 1042 (1985), the defendant was convicted of reckless homicide, the evidence showing that, while he was intoxicated, he drove his car into the other lane of traffic and collided with the victim's car. The court held that the defendant's act contributed to the victim's death, even had her alleged intoxication also helped to bring the accident about. *Gruner* is clearly a but-for-cause case. Finally, in *People v. Kent*, 111 Ill. App. 3d 733 (1982), the court held that the evidence was insufficient to prove that the defendant had murdered her baby by feeding her alcoholic beverages. The court relied on the extremely weak evidence of causation, and it had no need to discuss competing theories of causation or the definition of "contributing cause." *Id.* at 738-39.

¶ 93     When we turn to foreign and nonjudicial authority on the meaning and application of the term "contributing cause," the results are mixed. Some authorities, in the tort and criminal contexts, appear to incorporate the idea of but-for causation into that of contributing causation. Others do not. We turn to a few examples, recognizing that we cannot be comprehensive.

¶ 94     In the criminal context, not all courts treat a "contributing cause" as limited to either a but-for cause or one of multiple independently sufficient causes, and at least two have rejected the proposition that a mere "contributing cause" is legally sufficient for a conviction. In *Abney v. State*, 766 N.E.2d 1175 (Ind. 2002), the defendant was charged under a statute that made it a felony to operate a motor vehicle with a specified percentage of alcohol in his blood if the offense resulted in the death of another person. *Id.* at 1177; see Ind. Code Ann. §§ 9-30-5-1(a), 9-30-5-5 (West 1993). The defendant allegedly struck a bicyclist, killing him. *Abney*, 766

N.E.2d at 1176. At trial, he argued in part that the bicyclist might have been hit by a previous motorist and later collided with the defendant's car. *Id.* The trial court instructed the jury that the prosecution needed to prove only that the defendant's conduct was a " 'contributing cause' " of the victim's death. *Id.* The appellate court held that the instruction was reversible error because the jury should have been instructed that the State needed to prove that the defendant's conduct had been a " 'substantial cause' " of the victim's death. *Id.* at 1176-77 (quoting *Abney v. State*, 758 N.E.2d 72, 76 (Ind. Ct. App. 2001)).

¶ 95 The Indiana Supreme Court agreed. Noting that a leading law dictionary defined "contributing cause" broadly as " 'a factor that—though not the primary cause—plays a part in producing a result' " (*id.* at 1178 (quoting Black's Law Dictionary 212 (7th ed. 1999))), the court repudiated this measure of causation, explaining that it would have allowed the jury to convict the defendant even under his theory of the case and would allow a jury to convict a defendant who, while driving under the influence of alcohol, struck a child who had suddenly darted out between two parked cars. *Id.* It appears that, for the court, the difference between a "contributing cause" and a "substantial cause" was that the latter also must be a proximate cause of death. See *id.* at 1177-78.

¶ 96 In *State v. Seymour*, 673 A.2d 786 (N.H. 1996), a murder case, the trial court instructed the jury that, in order to "cause" the death of another, a defendant's act " 'must be more than a mere possible cause or a contributing cause; the cause must be a direct and substantial factor in bringing about the death. *** [A] legal cause is the cause without which the event would not have occurred, and the predominating cause ***.' " *Id.* at 794. The court of review held that the instruction was legally correct and appropriate, as the jury should not have convicted the

defendant had it found that his charged acts were " 'a mere possible cause or a contributing cause' " of the victim's death. *Id.*; see also *State v. Bundy*, 539 A.2d 713, 714 (N.H. 1988).

¶ 97    On the other hand, in *State v. Baker*, No. 31, 142-KA (La. App. 2 Cir. 10/28/98); 720 So. 2d 767, the court held that the defendant suffered no prejudice from the trial court's failure to use the term "substantial factor" as well as the term "contributing cause" in instructing the jury on causation. *Id.* at 773. The court noted that "these standards are used interchangeably." *Id.* at 772.

¶ 98    The opinions cited in the committee note do not resolve our concerns, and the foreign authorities are no more satisfactory.[1]    The term "contributing cause" might well deserve to be retired. Nonetheless, it is still in active service, its severe identity crisis notwithstanding.

¶ 99    We return to the specific issue on appeal: did the trial court abuse its discretion (see *People v. Pierce*, 226 Ill. 2d 470, 475 (2007)) in refusing defendant's tendered instructions on causation and using IPI Criminal 4th No. 7.15 (Supp. 2011) instead? We must acknowledge that, in view of the foregoing discussion, the court faced a difficult choice. Defendant offered a set of instructions that excluded the term "contributing cause," which lacks clear definition in Illinois law and, indeed, in American law. Her tendered instructions at least referred to but-for

---

[1] We note that IPI Criminal 4th No. 7.15 (Supp. 2011) requires the State to prove beyond a reasonable doubt that "[the] defendant's acts were a contributing cause of the death *and* that the death did not result from a cause unconnected with the defendant." (Emphasis added.) IPI Criminal 4th No. 7.15 (Supp. 2011). This phraseology, using the conjunctive, *appears to* require both (1) contributing causation (whatever that means) *and* (2) something more—what follows "and." But what follows "and" *appears* to be proximate causation, not but-for causation. See *Kidd*, 2013 IL App (2d) 120088, ¶ 34.

causation, one of the primary types of causation recognized as valid by *Burrage* and numerous other judicial (and scholarly) opinions.

¶ 100   However, defendant's tendered instructions suffered from defects also.  One, that they included only "but-for" causation and not multiple-independent causation, we have held was not crucial under the unique circumstances here.  A second, that they needlessly repeated the concept of proximate cause and potentially confused causation-in-fact with foreseeability, which we disapproved in *Kidd*, was perhaps more serious.

¶ 101   But an important consideration is that IPI Criminal 4th No. 7.15 (Supp. 2011), for all of its serious deficiencies, is still the pattern instruction and does track language repeatedly used in Illinois case law.  That this language is anything but clear to courts and legal scholars implies that it was probably as ambiguous and difficult of application to the jurors.  Nonetheless, it is difficult to fault the trial court for giving an instruction that was based on Illinois law instead of a set of instructions that deviated from it and of which we had already disapproved in part. Ultimately, we conclude that the trial court did not abuse its discretion in this difficult situation.

¶ 102   In declining to find reversible error, we also note that it is not clear whether the defect in the instruction prejudiced defendant.  Explicitly instructing the jury that the State had to prove that the heroin was a but-for cause of Taylor's death might have affected the verdict, but this appears unlikely.  Harkey's statement that Taylor died of "cocaine *and* heroin intoxication" (emphasis added) strongly suggested that both drugs had been necessary to produce death.  (Of course, his testimony that either one "could" cause death might have undermined this strong suggestion.)  Possibly, the jury found that the cocaine could have independently caused death but that the heroin was a "contributing cause" in that it increased the likelihood of death by some

unquantifiable degree or contributed to some degree to the medical condition that actually caused death.  But the likelihood of this dubious theory having been adopted is speculative.

¶ 103   We note, however, that the pattern instruction used in this case deserves serious scrutiny, as does the case authority on which it is based.  We agree with *Burrage* that, if a given act was neither a but-for cause of death nor an independently sufficient cause of death, it should not be a "cause" of death.[2]  At least one opinion of our appellate court appears to hold otherwise.  See *Martinez*, 348 Ill. App. 3d at 529-30.

¶ 104   Moreover, in the tort and criminal contexts, there is widespread agreement with *Burrage* that "cause" should mean, at a minimum, cause-in-fact (but-for cause), except in the narrow range of multiple-sufficient-cause cases.

¶ 105   In *Callahan v. Cardinal Glennon Hospital*, 863 S.W.2d 852 (Mo. 1993), a medical negligence case involving multiple tortfeasors and more than one potential cause of injury, the plaintiff argued that the liability of the remaining defendant should be based on the "substantial factor" test and not the (allegedly) more restrictive but-for test.  *Id.* at 860-61.  The court concluded that, despite suggestions to the contrary in earlier opinions of the state's courts, the "substantial factor" test requires but-for causation, except in the narrow class of cases in which

---

[2] One possible qualification is that a defendant's act that hastens the victim's death should still qualify as a cause, even if the victim was already mortally wounded by another person's independent act.  See *State v. Christman*, 249 P.3d 680, 683, 688 (Wash. Ct. App. 2011) (expert opinion that methadone defendant gave victim hastened victim's death was sufficient to prove guilt under statute similar to Illinois drug-induced-homicide law); Wayne R. LaFave, Substantive Criminal Law § 6.4(b), at  469 (2d ed. 2003).

the defendant's act is one of multiple independently sufficient causes. *Id.* at 862-63**.** To expand the idea of causation any further would do violence to the basic concept itself:

> " 'But for' is an absolute minimum for causation because it is merely causation in fact. Any attempt to find liability absent actual causation is an attempt to connect the defendant with an injury *** that the defendant had nothing to do with. Mere logic and common sense dictates that there be some causal relationship between the defendant's conduct and the injury or event for which damages are sought." *Id.* at 862.

¶ 106 The Missouri Supreme Court's reasoning in *Callahan* is as applicable to criminal cases as to tort cases and as appropriate for multiple acts by one defendant (only one of which is charged as an offense) as it is for acts by multiple persons (only one of whom is a defendant). Moreover, the proposition that but-for causation is required for a conviction of a criminal offense (with the limited exception of multiple-independent causation) is widely accepted by both courts of review and scholars. See, *e.g.*, *State v. Bauer*, 329 P.3d 67, 71 (Wash. 2014); *State v. Serebin*, 350 N.W.2d 65, 71 (Wis. 1984) (citing 1 Charles E. Torcia, Wharton's Criminal Law § 26, at 122-26 (14th ed. 1978)).

¶ 107 We reiterate our concern that, using the "contributing cause" instruction, a jury will convict a defendant of criminal homicide based on nothing more firm than a finding that her charged conduct "ma[de] a positive incremental contribution, however small, to a particular result." *Burrage*, 571 U.S. at ___, 134 S. Ct. at 891. This does not appear to us to be an acceptable risk; it can be lessened or alleviated by a change in the instruction or, perhaps, by changing the law of causation (statutory or judicial) on which instructions are based.[3]

---

[3] A statutory solution to the problem is found in *Commonwealth v. Kakhankham*, 132 A.3d 986 (Pa. Super. Ct. 2015), in which the defendant was convicted of violating a statute

¶ 108 We therefore reject defendant's claim of instructional error, though we note that the pattern instruction, while accurately stating the law in a technical sense, raises some concerns with respect to clarifying proper principles of law for juries that must decide difficult causation issues in homicide cases.

¶ 109 Defendant raises a second and more limited challenge to the instruction based on IPI Criminal 4th No. 7.15 (Supp. 2011). She notes that it referred broadly to "defendant's acts" and "the acts of the defendant" and not specifically to the act on which the charge was based—her delivery of the heroin. Because defendant's "acts" included the delivery of both the heroin and

essentially similar to the Illinois drug-induced-homicide statute. The statute required proof that the victim " 'die[d] as a result of using the substance' " that the defendant had delivered. *Id.* at 991 (quoting 18 Pa. Cons. Stat. Ann. § 2506(a) (West 2011)). In holding that the statute was not unconstitutionally vague, the court relied on the general statutory definition of causation in criminal cases, which included the requirement that the conduct be "an antecedent but for which the result in question would not have occurred." *Id.* at 993 (quoting 18 Pa. Cons. Stat. Ann. § 303(a) (West 2011)). Thus, the state criminal code clearly required but-for causation. *Id.* We respectfully submit that our legislature might do well to consider a similar clarification of causation in criminal cases, with the qualification noted in *Burrage* and elsewhere for multiple independently sufficient acts.

Also, the clarification can come by judicial decision, even absent a statute. In construing an act similar to the Illinois drug-induced-homicide law, the Court of Appeals of Washington held that the causation requirement consisted of (1) cause-in-fact (but-for causation) and (2) legal or "proximate" cause. *Christman*, 249 P.3d at 686-87. The court noted that it was following long-standing and universally recognized principles of criminal law. *Id.* at 686.

the cocaine, she contends that the instruction potentially misled the jury into believing that the uncharged act of delivering the cocaine could be considered as a separate basis for convicting her of drug-induced homicide. We agree with defendant that the instruction was inaptly phrased. But we agree with the State that, under the circumstances, any error was harmless.

¶ 110   IPI Criminal 4th No. 7.15 (Supp. 2011) does indeed suffer from the defect of which defendant complains. It refers to "the acts of the defendant" rather than the acts charged as offenses, and to "a cause unconnected with the defendant" rather than a cause unconnected with those acts. IPI Criminal 4th No. 7.15 (Supp. 2011). As applied to multiple defendants, the phraseology is proper. As applied to multiple acts by one defendant, however, it is potentially misleading. Here, for example, defendant's delivery of the cocaine was obviously not unconnected with her. But the issue was whether Taylor's death was connected with her *charged conduct*, not merely with her. Thus, IPI Criminal 4th No. 7.15 (Supp. 2011) might well benefit from amendment in this regard as well.

¶ 111   Nonetheless, we cannot say that the deficiency in the given instruction—a reflection of the deficiency in IPI Criminal 4th No. 7.15 (Supp. 2011) itself—resulted in reversible error. The test is whether the instructions, read as a whole, fully and fairly stated the applicable law. *People v. Bannister*, 232 Ill. 2d 52, 81 (2008). Here, the instructions conveyed to the jury that the proper focus was on defendant's act of delivering the heroin and not her act of delivering the cocaine. As the State contended, the other pertinent instructions clarified that defendant was charged with causing Taylor's death by delivering the heroin. Also, during closing arguments, both parties stressed that the delivery of the heroin was the gravamen of the charge and that defendant could not be convicted based on the delivery of the cocaine. Therefore, we see no reversible error in the deficient instruction.

¶ 112  We finally leave defendant's first claim of error.  We turn to her other claims of error in the trial court's choice of jury instructions.

¶ 113  Defendant contends that the court abused its discretion in refusing to give the jury one of her alternative instructions based on *Strother*, 53 Ill. 2d 95.  The gist of these instructions was that the testimony of a witness who is a narcotics addict should be scrutinized carefully because "habitual users of narcotics become notorious liars."[4]  (Internal quotation marks omitted.)  *Id.* at 99.  Defendant argues that it was necessary to remind the jury that, when she gave her statement to the police, her drug addiction cast doubt on the truth of her inculpatory remarks.

¶ 114  Defendant's reasoning is curious, since her proposed instructions applied to the testimony of a witness, but she was not a witness at trial and provided no testimony.  The only person to whom the instructions applied was Walker, who was called by defendant.  Why defendant would want a cautionary instruction on the credibility of her own witness is unclear.  In any event, her argument lacks any legal basis.

---

[4] *Strother* ultimately relied on (and essentially quoted) a 1916 opinion of the Idaho Supreme Court, which based its psychiatric generalization on a treatise on medical jurisprudence (undated in the opinion).  See *State v. Fong Loon*, 158 P. 233, 237 (Idaho 1916).  Whether this medical theory from the era of Woodrow Wilson is still accepted is a pertinent question.  See *Coates v. United States*, 558 A.2d 1148, 1154 (D.C. 1989) (commenting that "the approach of the Supreme Court of Idaho in *Fong Loon* has probably been shown to be too one-dimensional in the light of the variety of scientific opinions expressed on the issue in the seventy-three years since that case was decided").  As defendant's claim of error is meritless anyway, however, the question can wait.

¶ 115   Aside from failing to cite any opinion holding that an "addict instruction" should have been given to the jury (*Strother* and the authorities it cites do not), defendant overlooks that our supreme court has held otherwise. "[I]t is not reversible error to deny a tendered addict instruction, where evidence of the addiction is before the jury so that it can make its own determination of the believability of the witness." *People v. Steidl*, 142 Ill. 2d 204, 238 (1991). In *Steidl*, where the proposed addict instruction actually applied to witness testimony, the court held that the trial court properly refused, as the witness's drug addiction was brought out on direct and cross-examination and the jury received the standard instruction on its prerogative to decide witness credibility. *Id.* at 238-39. *Steidl* controls. Defendant's argument is without merit.

¶ 116   Defendant argues next that the trial court abused its discretion in refusing three tendered instructions, all based on pattern instructions. These were (1) her second instruction, based on Illinois Pattern Jury Instructions, Criminal, No. 4.16 (4th ed. 2000), defining actual possession, constructive possession, and joint possession; (2) her sixth instruction, which was based on Illinois Pattern Jury Instructions, Criminal, No. 17.13A (4th ed. 2000), and explained that an agreement may be implied from the conduct of the parties and need not be express; and (3) her seventh instruction, which was based on Illinois Pattern Jury Instructions, Criminal, No. 17.05A (4th ed. 2000), and defined "delivery."

¶ 117   We see no error in the trial court's refusal to give these instructions. The basis for defendant's second instruction eludes us, since she was charged with unlawful delivery of heroin and with drug-induced homicide based on that delivery, not with possession. Defendant theorizes that the instruction should have been given because the jury could reasonably have concluded that, at some point, Taylor had jointly possessed the heroin, "which would have

negated the possibility of a delivery." This argument simply makes no sense. The State's theory was that defendant obtained the heroin, took it to Wheaton, and physically gave it to Taylor, after which Taylor used it and died. How this negated the possibility of a delivery is a mystery. *People v. Coots*, 2012 IL App (2d) 100592, which defendant cites, involved entirely different facts and does not suggest that possession at some point by the victim negates delivery by the defendant.

¶ 118 Defendant's sixth instruction was based on a pattern instruction intended to supplement the elements instruction for calculated criminal cannabis conspiracy. See Illinois Pattern Jury Instructions, Criminal, No. 17.13, Committee Note, at 321 (4th ed. 2000). The supplemental instruction explains when an agreement, an element of that offense, may be inferred. It "may be given in a conspiracy case when it would help the jury understand the issues." Illinois Pattern Jury Instructions, Criminal, No. 17.13A, Committee Note, at 321 (4th ed. 2000). The trial court did not err in refusing to give an instruction that is reserved for conspiracy cases and, even then, is purely discretionary.

¶ 119 Defendant's claim that the trial court erred by refusing her seventh instruction, defining delivery, is forfeited, as she has failed to support it with citation to pertinent authority. See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013); *Spinelli v. Immanuel Lutheran Evangelical Congregation, Inc.*, 118 Ill. 2d 389, 401 (1987). In any event, the argument lacks merit. The State's theory was that defendant physically gave the heroin to Taylor, who used it and died. There was no evidence of any other type of delivery. "[W]hen *** the evidence indicates that the delivery in question was an actual physical transfer of possession, no definition of the term need be given to the jury. The term, in this sense, is commonly understood by laymen." Illinois Pattern Jury

Instructions, Criminal, No. 17.05A, Committee Note, at 308 (4th ed. 2000). The trial court did not abuse its discretion in refusing to define a commonly understood term.

¶ 120 Defendant makes one last claim of instructional error: that the trial court abused its discretion in refusing her third tendered instruction. The lengthy instruction, in essence, stated that the failure of a law-enforcement officer to preserve "investigative material" allows the jury to infer that, had the investigative material been preserved, it "would have led to the presentation of evidence unfavorable to the State's case." Defendant based the instruction on section 114-3(b) of the Code of Criminal Procedure of 1963 (725 ILCS 5/114-13(b) (West 2014)) and on Salzmann's testimony that, sometime after the recorded interview of defendant, he inadvertently threw out Scott's notes of the interview. Defendant has again forfeited her claim by relying on a summary assertion without citing pertinent authority. See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013); *Immanuel Lutheran Evangelical Congregation, Inc*., 118 Ill. 2d at 401. In any event, defendant has shown no reversible error. She cites only section 114-3(b), which applies to discovery in criminal cases and requires law-enforcement agencies investigating homicide offenses to provide the prosecuting authorities with investigative materials that they have generated, including potentially exculpatory evidence. Contrary to defendant's assertion, the section does not state what inferences a jury may draw from the failure to preserve investigative materials. Also, the notes were limited to suggesting topics for questioning. Thus, the proposed instruction was theoretically dubious, as it created a presumption (that the notes were favorable to defendant) that was simply not valid. For this reason, the absence of the instruction also worked no undue prejudice to defendant.

¶ 121 We turn finally to defendant's contention that she was not proved guilty beyond a reasonable doubt. For obvious reasons, we have delayed discussing this issue until after our

resolution of the primary instructional issue (and for convenience the other instructional issues). Defendant's contention consists of three tersely-phrased arguments: (1) the jury could not have properly convicted her had it been instructed properly (incorporating her first claim of error); (2) the evidence left a reasonable doubt as to whether Taylor was poisoned by the heroin that defendant delivered or the heroin that she had used the evening that she returned from jail; and (3) Harkey's testimony was inconclusive as to whether heroin or cocaine caused Taylor's death.

¶ 122   As noted earlier, in deciding whether defendant was proved guilty beyond a reasonable doubt, we must view all the evidence in the light most favorable to the State. *Collins*, 106 Ill. 2d at 261.   We ask whether any rational fact finder could have found the elements of the offense proved beyond a reasonable doubt. *People v. Ward*, 154 Ill. 2d 272, 326 (1992).   The trier of fact is responsible for determining the witnesses' credibility, weighing their testimony, and deciding on the reasonable inferences to be drawn from the evidence. *People v. Hill*, 272 Ill. App. 3d 597, 603-04 (1995).   It is not our function to retry the defendant. *People v. Lamon*, 346 Ill. App. 3d 1082, 1089 (2004).

¶ 123   We may dispose of the first and third arguments together.   Assuming that the State was required to prove that the delivery of the heroin was a but-for cause of Taylor's death, Harkey's testimony was sufficient to do so.   Harkey's expert opinion was that Taylor died of "heroin and cocaine intoxication due to intravenous drug use."   A logical inference from this testimony (and the factual basis for it) was that the cocaine and heroin together caused Taylor's death and that the cocaine alone did not.   We cannot say that the evidence required the jury to entertain the possibility that the cocaine by itself caused Taylor's death and that the heroin was superfluous; indeed, the evidence of heroin intoxication appears to have been stronger than the evidence of cocaine intoxication (or at least the jury could have so viewed it).

¶ 124  Defendant's second argument is based on other evidence—which, unfortunately, she does not locate with citations to the record, other than general references to stretches of testimony that purportedly show that, shortly before she died, Taylor had some heroin left over from her previous day's use.  Most of this testimony came from Walker, who was severely impeached on cross-examination.  (Also, Walker admitted to being a drug addict and thus, according to defendant herself, was such a habitual liar that the jury should have been instructed specifically to give her testimony heightened scrutiny.)  Defendant does not explain why the jury was required to credit Walker's testimony.

¶ 125  Defendant also cites Salzmann's testimony on cross-examination that he "would presume" that, after Taylor used some heroin on Tuesday, she still had some heroin left over before defendant and Walker arrived in Wheaton Wednesday evening.  The jury could have discounted Salzmann's equivocal statement about what he "presume[d]" in relation to facts of which he had no firsthand (or even secondhand) knowledge.  Moreover, the jury also heard evidence that, early on Wednesday, Taylor had snorted heroin in the bathroom; a reasonable inference was that she had used any remaining heroin (the existence of which was hardly a necessary inference from the evidence anyway).

¶ 126  Nonetheless, even assuming that Taylor had used heroin the previous day and *might* have had some left over that evening, the jury could still conclude beyond a reasonable doubt that it was the heroin that defendant delivered the next evening that Taylor took and that combined with the cocaine to cause her death.  The jury could infer that Taylor's request for heroin on the day of her death meant that she was out of heroin at the time.  The jury did not need to believe that she agreed to buy heroin that she did not need.

¶ 127  Defendant also contends that the heroin bindles that were recovered were packaged exactly as defendant said they had been when she gave them to Taylor.  However, her sole support for this is the assertion in her statement of facts that "[t]wo closed packets of heroin were recovered at the scene."  The pages of the record that defendant cites for this statement do not support it; they consist of defendant's written statement as read into the record by Salzmann and Salzmann's testimony on the chain of custody for the evidence recovered at the scene.  Even if we grant that two closed packets were recovered at the scene, it need not follow that Taylor did not open them and use any of their contents.  She could have opened them and closed them again.  There was no evidence that the heroin that she had allegedly used the previous day was recovered from the scene.  The jury's verdict was supported by proof beyond a reasonable doubt.

¶ 128  In her argument on reasonable doubt, defendant also contends in one sentence that she was unfairly prejudiced by the prosecutor's assertion in closing argument that, according to Harkey, the heroin was fatal by itself.  Defendant's assertion cites neither the record nor any pertinent authority, so we find it forfeited.[5]  See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013); *Immanuel Lutheran Evangelical Congregation, Inc*., 118 Ill. 2d at 401.  In any event, although our discussion of Harkey's testimony in the context of the principal instructional issue on appeal does imply that the prosecutor's comments were inaccurate, we note that defendant argued as much to the jury—and that the most central portion of Harkey's testimony was his unequivocal opinion that Taylor's death resulted from the combined effect of the cocaine and the heroin.  Absent more serious argument by defendant, we decline to find reversible error here.

---

[5] Defendant's cursory and highly argumentative statement of facts (see Ill. S. Ct. R. 341(h)(6) (eff. Feb. 6, 2013)) does refer specifically to the comments, which we have included in our statement of facts.

¶ 129   For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed.  As part of our judgment, we grant the State's request that defendant be assessed $50 as costs for this appeal.  55 ILCS 5/4-2002(a) (West 2014); see also *People v. Nicholls*, 71 Ill. 2d 166, 178 (1978).

¶ 130   Affirmed.